# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420

---

| | |
|---|---|
| Appellate Court Caption | CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee to American National Bank and Trust Company of Chicago under Land Trust Agreement Dated May 20, 1999, and known as Trust Number 125083-05; SOUTH BRANCH, LLC, Plaintiffs-Appellants, v. JS II, LLC, Defendant-Appellee.–SOUTH BRANCH, LLC, Plaintiff-Appellee and Cross-Appellant, v. RIVER VILLAGE I, LLC; JS II, LLC, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-06-3420, 1-07-0212 cons. |
| Filed | August 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly found that plaintiff owned prescriptive easements across three driveways that provided the only means of ingress and egress by land to a warehouse on plaintiff's land, even though the easements crossed over a former railroad right-of-way that belonged to defendants, defendants were properly enjoined from interfering with plaintiff's use of the easements and defendants were assessed damages for digging a trench across one of the easements. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-CH-4309, 02-CH-656; the Hon. Martin S. Agran and the Hon. Mary Anne Mason, Judges, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Patricia S. Spratt and Kathleen F. Howlett, both of Shefsky & Froelich Ltd., of Chicago, for appellants.

William J. Holloway, of King Holloway, LLC, of Chicago, for appellees.

Panel

JUSTICE GARCIA delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Palmer concurred in the judgment and opinion.

**OPINION**

¶ 1    This consolidated appeal concerns disputes between adjacent landowners over a right-of-way.[1] Plaintiff South Branch owns the property immediately south of the property owned by defendant JS II. Defendant River Village was a developer of the JS II property. A right-of-way, formerly owned by a railroad company, crosses both properties. The dispute between the parties centers on that portion of the right-of-way that intersects three driveways on the South Branch property.

¶ 2    In the first of the parties' two lawsuits (circuit court No. 02 CH 5656), Judge Mary Anne Mason, after a bench trial, found that JS II owns the right-of-way, a ruling that South Branch did not appeal. After trial concluded, but before judgment issued, South Branch filed a motion to reinstate a claim for ownership by reversion of the right-of-way based on abandonment of its use by a railroad, a claim it had voluntarily dismissed almost four years earlier. Judge Mason denied the motion. However, she ultimately ruled that South Branch owns three easements across the right-of-way at the location of the existing driveways that intersect with Racine Avenue as the only means to access the entire South Branch property from a Chicago street. The court issued a permanent injunction barring the defendants from interfering with the use of the easements and ordered the defendants to pay $2,000 in nominal damages and $10,000 in punitive damages for trespass arising from the defendants' excavation of a trench along the right-of-way, which rendered one driveway useless, and which encroached upon the South Branch property.

¶ 3    The second lawsuit (circuit court No. 06 CH 4309) was dismissed with prejudice by Judge Martin S. Agran. In this complaint, South Branch reasserted its claim of ownership by reversion of the right-of-way, the same claim that Judge Mason refused to reinstate in the

---

[1]We follow the parties' designation of the former railroad property as a right-of-way, although the term right-of-way generally signifies an "easement." *Schnabel v. County of Du Page*, 101 Ill. App. 3d 553, 558 (1981). It appears the property was conveyed to a railroad company by fee-simple deed in 1885; a successor railroad company ultimately transferred title to JS II in approximately 1998.

-2-

case pending before her. Judge Agran ruled the pending ownership claim by JS II before Judge Mason rendered South Branch's complaint duplicative as it constituted "another action pending between the parties for the same cause." 735 ILCS 5/2-619(a)(3) (West 2010).

¶ 4 Under the manifest weight of the evidence standard, we affirm Judge Mason's judgment that South Branch owns the three easements, as a contrary conclusion is not clearly evident. We affirm the court's injunction against JS II, and those acting on its behalf, as necessary to prevent future harm to the easements owned by South Branch. We find the court did not abuse its discretion in awarding nominal and punitive damages in light of the defendants' clear trespass, which the court found was committed with the intention of harassing South Branch. Finally, we agree with the trial court that South Branch's motion to reinstate its claim of ownership by reversion was filed too late, where reinstatement was sought after the close of evidence and after the presentation of closing arguments.

¶ 5 We affirm Judge Agran's dismissal with prejudice of South Branch's 2006 complaint that reasserted a claim of ownership by reversion of the right-of-way. South Branch's claim of ownership was rendered moot by Judge Mason's verdict that JS II owned the right-of-way, a finding that South Branch failed to challenge in its cross-appeal of the denial to reinstate its ownership-by-reversion claim.

¶ 6                                           BACKGROUND

¶ 7 Plaintiff South Branch and defendant JS II are the owners of two adjacent parcels of land. South Branch owns a lot that lies directly to the south of the property owned by JS II, with both properties bordered on the west by the south branch of the Chicago River and on the east by Racine Avenue. A right-of-way in the form of a thin strip of land crosses both properties. The circuit court ruled that JS II owns the right-of-way that traverses the South Branch property, a ruling that South Branch did not appeal.

¶ 8 There are three driveways on the South Branch property that cross the right-of-way owned by JS II. Each driveway begins on the east at Racine Avenue. The driveways provide the only means of ingress and egress by land to a warehouse on the South Branch property from a Chicago street. The three driveways lead separately to the "atrium" of the warehouse, the south parking lot, and the north parking lot, all of which are situated between the Chicago River on the west and the right-of-way on the east.

¶ 9 In appeal No. 1-07-0212, JS II challenges Judge Mason's rulings finding that South Branch owns prescriptive easements over the right-of-way at the location of the three driveways, her award of damages for the defendants' trespass against the easements and the South Branch property, and the issuance of an injunction barring the defendants from interfering with South Branch's reasonable use of the easements. In its cross-appeal, South Branch challenges only Judge Mason's denial of its motion to reinstate its ownership-by-reversion claim over the right-of-way, which it voluntarily dismissed nearly four years before trial.

¶ 10 In appeal No. 1-06-3240, South Branch contends Judge Agran erred as matter of law in dismissing its complaint reasserting its claim of ownership by reversion of the right-of-way, the same claim Judge Mason denied leave to reinstate following the bench trial.

-3-

¶ 11    The title history of the two properties dates back to 1880 when the now South Branch property and the now JS II property were owned as a single plot of land in fee simple by John Yale and several others. In 1880, the Yale group conveyed a 30-foot-wide strip of land to the Chicago and Indiana Stateline Railway as a right-of-way, which allowed the railroad to cross virtually the entire property. This is the same right-of-way at issue in this case. The grant allowed for a "perpetual lease" of 99 years, provided the land continued to be used for railroad purposes. The grant document contained a covenant requiring the railroad to "reasonably accommodate" businesses on either side of the right-of-way. At some point, railroad tracks were constructed on the right-of-way.

¶ 12    In 1885, the Yale group conveyed full ownership of the strip of land to the railroad, "as a railroad right-of-way." The conveyance did not contain a covenant requiring a reasonable accommodation for businesses to cross the right-of-way. While the record lacks a full tracing of the title of the South Branch property and the right-of-way to the present, references to easements across the right-of-way appear in different documents over the years. In 1911, the warehouse on what is now the South Branch property was built. By 1919, Central Manufacturing District owned the single plot of land that comprised both the South Branch property and the JS II property. A 1919 document conveyed what is now the South Branch property from Central Manufacturing District to Albert Pick. The 1919 document referenced easements over the railroad right-of-way on the conveyed land.

¶ 13    In 1958, when the pertinent railroad companies split up, the right-of-way was transferred into a trust with unknown trustees and then conveyed to new owners. The now South Branch property was also transferred in 1958 in like manner. A 1958 document that transferred the right-of-way property referenced the original 1880 Yale conveyance, which expressly provided that businesses be accommodated in crossing the railroad right-of-way. On the same day of the filing of the 1958 transfer of the right-of-way property, a document was filed that contained express easements granted by Chicago Junction Railway to Central Manufacturing District (then owners of the JS II property), which required the grantee to maintain, repair, use, and permit others to use the roadways already present that crossed the right-of-way. This document also referenced the 1880 Yale conveyance.

¶ 14    By 1978, Spiegel, Inc., owned the South Branch lot, which it conveyed in four parcels to Goodwill Industries. That same year, Goodwill leased the south portion of the large parking lot on the property to Spiegel. The lease contained a provision that an easement existed over the right-of-way to permit ingress and egress to the lot.

¶ 15    Sometime in 1978 or 1979, Goodwill conveyed its entire property to Harry Alter Heating and Air Conditioning. Harry Alter began construction to improve the property and employed Warren Sutton as building engineer to oversee the construction. Sutton began working at the property on a daily basis shortly after the purchase and was responsible for its general upkeep. At the time Sutton began his employment as building engineer, the three driveways were already in existence and in daily use. Sutton testified that in 1986 or 1987, Harry Alter sold the property to Harris Markus Furniture Company. Sutton continued his employment as building engineer of the property with Harris Markus. Sutton testified that during his time working on the property, he observed trains pass through on the tracks a few times. The most recent time occurred in the 1980s. Sutton recalled that one or two such trains damaged

shrubbery lining the tracks. According to Sutton, the tracks were removed sometime in the 1980s.

¶ 16    South Branch purchased the property on June 7, 1999, from Harris Markus. At the time of South Branch's purchase, the right-of-way had been abandoned. Prior to closing on the land purchase, one of South Branch's members, Paul Levy, discovered the existence of the railroad right-of-way in a survey conducted in 1991. South Branch did not ask permission to use that portion of the right-of-way that crossed the driveways, nor did it discuss its anticipated crossing of the right-of-way with its owner prior to closing on the property. Instead, Levy obtained insurance over the easements from a title services company. Marshall Snow–the title insurance agent–testified that he issued the policy covering the easements because his investigation concluded that South Branch had valid easement rights over the driveways. After the purchase, South Branch retained Sutton as the property engineer until 2000 or 2001. Sutton testified that the three driveways were in continual use throughout his employment with the three different employers.

¶ 17    The JS II property came into existence with the 1919 division of the original Yale property into two parcels by Central Manufacturing District. In 1998, JS II began to acquire the property when it purchased portions of the land from Norfolk Southern Railroad, ConRail, and the City of Chicago. The ConRail deed conveyed property that included the right-of-way. The JS II property is now called Bridgeport Village, where defendant River Village constructed single-family homes. The defendants considered acquiring some or all of the South Branch property to add to the development; however, environmental concerns caused them to abandon the acquisition. On January 5, 2000, River Village recorded a postclosing notice of objection to South Branch's crossing of the right-of-way at the location of the three driveways.

¶ 18    On January 10, 2002, South Branch filed suit against JS II and River Village. The complaint was filed after the defendants excavated a trench on the right-of-way through one of the driveways, rendering it unuseable. The complaint sought damages for trespass, an injunction barring further interference with the driveways, and a declaration that South Branch owned the right-of-way by reversion, or, alternatively, that it owned three easements, either by grant or by prescription, across the right-of-way at the location of the driveways.

¶ 19    On June 7, 2002, the trial court granted South Branch's motion to voluntarily dismiss its claim of ownership of the right-of-way by reversion. On August 20, 2003, JS II filed a counterclaim seeking a declaration that it was the lawful owner of the right-of-way and that South Branch had no easement rights over the right-of-way. JS II sought a permanent injunction to bar South Branch from crossing the right-of-way for any purpose absent its express written permission.

¶ 20    Judge Mason conducted a five-day bench trial on the complaint and counterclaim, which ended on January 27, 2006, with the matter taken under advisement. On February 16, 2006, before the court issued its verdict, South Branch filed a motion to reinstate its claim of ownership of the right-of-way by reversion, which Judge Mason denied. She pointed out that the evidence had been limited to the claims pending before the court, with no evidence on reversion introduced. The court reasoned it was unfair to the defendants to permit

consideration of the claim after trial had ended. On June 21, 2006, Judge Mason entered an initial memorandum opinion and order, setting forth her findings following the bench trial. South Branch moved to amend the court's findings to include the locations and dimensions of the easements, which South Branch contended could be resolved by the parties if given time. The parties agreed to delay the entry of a final judgment.

¶ 21    On March 3, 2006, South Branch filed a new complaint against JS II only, asserting a claim of ownership of the right-of-way by reversion and a quiet title claim, which came to be heard by Judge Agran. JS II filed a motion to dismiss the complaint, arguing that it was duplicative of a claim pending before Judge Mason. Judge Agran agreed and dismissed the complaint with prejudice on October 25, 2006. South Branch filed a timely notice of appeal challenging Judge Agran's dismissal.

¶ 22    On December 19, 2006, Judge Mason entered an amended memorandum opinion and order setting out her final judgment on the 2002 complaint and counterclaim, which did not specify the locations of the prescriptive easements because the parties were never able to reach an agreement. Judge Mason found the passage of title to the right-of-way established ownership in JS II. The court ruled, however, that South Branch owned easements over the right-of-way at the location of the three existing driveways. The court permanently enjoined the defendants from trespassing on the easements or otherwise interfering with South Branch's use of the driveways. The court awarded South Branch nominal damages of $2,000 and punitive damages of $10,000 for the defendants' trespass of the South Branch property during their excavation of the right-of-way, which blocked, at least temporarily, the use of one driveway. The defendants appealed the trial court's adverse judgment, with South Branch filing a timely cross-appeal of the denial of its motion to reinstate its ownership-by-reversion claim.

¶ 23    We consolidated the appeal of Judge Mason's judgment with the appeal of Judge Agran's dismissal order. We address the case in its entirety.

¶ 24                                    ANALYSIS

¶ 25    Though the appeal from Judge Agran's ruling came first in time, the appeals from the bench trial before Judge Mason provide the necessary background to address all the issues raised by the parties. We begin our analysis with the appeals from the bench trial.

¶ 26    The defendants[2] challenge Judge Mason's finding that South Branch owns easements over the right-of-way. Further, the defendants argue that an injunction was unnecessary and South Branch was not entitled to any damages for trespass.

¶ 27    In its cross-appeal, South Branch contends Judge Mason erred when she denied its motion to reinstate its ownership-by-reversion claim. South Branch contends reinstating a claim is akin to refiling a complaint under section 13-217 of the Illinois Code of Civil

---

[2]As a matter of convenience and consistent with the briefs of the parties, we refer to the defendants throughout the appeal as if JS II and River Village stand together on all the issues raised; River Village, however, does not share ownership of the right-of-way with JS II.

Procedure (Code) (735 ILCS 5/13-217 (West 2010)), which grants a plaintiff the right to refile a complaint not otherwise barred by the statute of limitations. South Branch contends that if Judge Mason did not err in denying its motion to reinstate, then Judge Agran certainly erred in dismissing with prejudice its complaint asserting a timely claim for ownership by reversion, which it filed only after its motion to reinstate the claim was denied by Judge Mason.

¶ 28                                    Defendants' Appeal

¶ 29                                *Prescriptive Easements*

¶ 30    The defendants challenge the trial court's judgment that South Branch owned easements at the crossing of the right-of-way by the three driveways on three grounds: (1) failure to establish locations and dimensions is fatal to a claim of prescriptive easements; (2) all the elements to establish the claim of easements were not proved; and (3) the statute of limitations for the claim had run when South Branch filed its complaint in 2002.

¶ 31    The trial court reached its conclusions following a five-day bench trial, in which the trial judge as trier of fact assessed all the evidence adduced by the parties. In reviewing its verdict, we owe deference to the findings of the trial court. "Although a trial court's holding is always subject to review, *** [a court of review] will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence." *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356 (1967). "Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Id.* The evidence considered by the trier of fact included not only the testimony of the witnesses and the exhibits introduced into evidence, but reasonable inferences supported by the evidence that the trier of fact was free to draw. *People v. Fountain*, 2011 IL App (1st) 083459-B. In our review of the conclusions reached following a bench trial, we do not reweigh the evidence; nor does the conflicting nature of the evidence render the verdict unreasonable. We will not reverse a judgment after a trial if reasonable persons might draw different conclusions from the evidence and a fair question is raised by the proof. *Hilbert v. Dougherty*, 34 Ill. App. 2d 174, 179 (1962). "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). "The establishment of an easement by prescription almost always is a question of fact." *City of Des Plaines v. Redella*, 365 Ill. App. 3d 68, 75-76 (2006); *Schultz v. Kant*, 148 Ill. App. 3d 565, 569 (1986) ("the establishment of a prescriptive easement is almost always a question of fact, especially with regard to whether the use is adverse or permissive").

¶ 32    "An easement is a right or privilege in the real estate of another." *McMahon v. Hines*, 298 Ill. App. 3d 231, 235 (1998). If an easement is found to exist, the owner of the easement has the right, for a limited purpose, to pass over or use the land of another. *Id.* "The tract of land

benefitted by the easement is the dominant tenement or estate, and the land burdened with the easement is the servient tenement or estate." *McCann v. R.W. Dunteman Co.*, 242 Ill. App. 3d 246, 254 (1993). An express easement, or an easement by grant, is created by agreement between the owners of the dominant and servient estates. *McMahon*, 298 Ill. App. 3d at 236. Conversely, an easement by prescription is established by long-term use without consent of the owner of the servient estate. *Redella*, 365 Ill. App. 3d at 75. To prove a prescriptive easement, the use of the subject land must be "adverse, exclusive, under a claim of right, continuous and uninterrupted, with the knowledge of the owner, but without his consent." *Id.* The elements must coexist for 20 years. *Id.* at 74-75. It is the claimant's burden to establish the elements for a prescriptive easement "distinctly and clearly." *Bogner v. Villiger*, 343 Ill. App. 3d 264, 269 (2003). However, "the law recognizes rebuttable presumptions with regard to the establishment of adversity" when the other elements have been proved and the origin of the alleged easement is unclear. *Light v. Steward*, 128 Ill. App. 3d 587, 596 (1984).

¶ 33    The easements at issue in this case are appurtenant easements. *Light*, 128 Ill. App. 3d at 591 (an appurtenant easement exists when at least "one terminus of the claimed easement is on the land of the party claiming it"). The driveways begin on the South Branch property, cross the right-of-way, and resume on the South Branch property. "A principle of concurrent rather than exclusive use underlies the law concerning easements." *Beggs v. Ragsdale*, 120 Ill. App. 3d 333, 337 (1983). "The owner of the servient estate must not interfere with the use of the easement for purposes of access by the owner of the dominant estate." *Id.* Illinois law recognizes that an easement used for the purpose of a driveway provides a "way of ingress and egress." *McMahon*, 298 Ill. App. 3d at 238.

¶ 34    South Branch argued before the trial court that the three driveways crossing the right-of-way were either easements by grant or by prescription. The defendants responded that a finding of easements by grant was precluded by the gap in title to the South Branch property that occurred in 1958 when the property was conveyed into a trust with unknown trustees, a gap that precluded South Branch's privity with the pre-1958 owners. *Roller v. Logan Landfill, Inc.*, 16 Ill. App. 3d 1046, 1053 (1974) (privity is established when there is an unbroken chain of title between the current user of a claimed easement and predecessors in title). We note that in a document filed in 1958, express easements over the right-of-way were granted by Chicago Junction Railway to the then-owner of the JS II property, Central Manufacturing District. Judge Mason found, however, consistent with the defendants' arguments, that no similar grant existed for the now South Branch property because South Branch could not establish privity with prior unknown owners. Accordingly, Judge Mason found that South Branch's claim of prescriptive easements could have begun no earlier than 1958. See *id.* at 1053 (given uncontroverted facts, "[t]he prescriptive easement could not have begun to run until 1964, the year [the owner] sold the [dominant] estate to [the current claimant of the easement]"). Ultimately, Judge Mason concluded that the period to claim prescriptive easements at the crossing of the right-of-way by the three driveways began in approximately 1978, which ripened into a claim 20 years later in approximately 1998. This made South Branch's 2002 complaint timely as filed "within 40 years after the claim upon which such action is based arises." 735 ILCS 5/13-118 (West 2010).

¶ 35    The defendants first contend that South Branch's failure to prove the "location and dimensions" of the claimed easements is fatal. The defendants rely on adverse possession cases for the proposition that South Branch bore a similar burden to prove its claim to prescriptive easements. See, *e.g.*, *Tapley v. Peterson*, 141 Ill. App. 3d 401, 404-05 (1986) (a claimant for adverse possession "must prove with reasonable certainty the location of the boundaries of the tract" over which he claims ownership). Because we conclude that the defendants' contention regarding proof of the locations and dimensions of the easements is more properly reviewed in the context of their challenge to the elements of prescriptive easement, we address this contention jointly with our review of the element of continuous use below. See *Bogner v. Villiger*, 343 Ill. App. 3d 264, 270 (2003) (evidence that the path of the claimed easement had changed during the prescriptive period precluded a finding of continuous use).

¶ 36    In this regard, we understand the defendants' overarching contention to be that the requisite elements to establish prescriptive easements cannot be proved because the crossing of the right-of-way was "permissive" from its inception. They contend that permissive use precludes a finding that the crossing of the right-of-way at the three driveways was continuous, exclusive, and adverse during the relevant time period. We address the express contentions by the defendants regarding these three elements. See *Schultz*, 148 Ill. App. 3d at 569 (where the defendant challenged the adequacy of the evidence as to only certain elements to establish a prescriptive easement, the court of review assumed the defendant did not disagree with the trial court's findings of the remaining elements).

¶ 37    We begin our review with the defendants' challenge to the finding of "continuous" use. The defendants specifically argue that an easement claimant must prove not only that "a definite easement exists *** [but] the extent of the easement." *Cf. Roller*, 16 Ill. App. 3d at 1052 (the "continuous use" element concerns "the behavior of the claimant"). They assert that "without identification of the dimensions and locations of the claimed easements" South Branch could not prove the "extent" of the easements. The defendants rely on several adverse possession cases to argue that South Branch had "the added burden of establishing the dimensions and boundaries to which it claims an easement." The defendants acknowledge a conflict in case law on whether adverse possession cases are controlling authority in addressing an easement claim: "The Fourth and Second District cases cited by the trial court *** cannot be reconciled with the Supreme Court and First District authority *** that proof of usage in one case relies upon the same elements as proof of possession in the other."

¶ 38    South Branch contends the defendants are disingenuous to claim that proof of the dimensions and locations of the driveways, and hence the easements, was inadequate given the state of the record. South Branch points to the defendants' contention that the three driveways were in use as early as 1911, when the warehouse was constructed, on which the defendants relied to argue the time to claim prescriptive easements had long expired. South Branch also notes that the defendants never argued that the locations of the driveways were ever altered over the years. South Branch affirmatively argues that the physical makeup of the three driveways renders indisputable their locations and dimensions. As made clear by the record, two of the driveways are paved and the third has a gate across it. South Branch argues that it is reasonable to infer from Sutton's testimony that, more likely than not, the

driveways were never altered since the start of the prescriptive period in 1978. In any event, according to South Branch, the defendants are mistaken because "dimensions and locations" are unnecessary where, as here, "South Branch and its predecessors used the easements under a claim of right."

¶ 39 The trial court entered its initial memorandum opinion on June 21, 2006, concluding that South Branch owned the three easements. With findings in its favor on its claim of prescriptive easements, South Branch moved to amend the memorandum opinion to include the precise locations and dimensions of the easements. South Branch attached to its motion a copy of its title insurance policy that insured the easements, which included legal descriptions. At the hearing on the motion, the parties agreed to postpone the entry of a final judgment to obtain a current survey of the easements in an effort to possibly reach an agreement on the precise locations and dimensions of the easements. When the parties appeared in court on December 19, 2006, for the entry of a final judgment, counsel for South Branch informed the court that the parties were unable to reach an agreement. The trial court issued its amended memorandum opinion and order, without specifying the locations and dimensions of the easements.

¶ 40 With no direct authority offered by the defendants that South Branch bears the burden to establish "the dimensions and locations" of the easements, we consider this contention only in the context of their challenge to the proof of continuous use. *Bogner*, 343 Ill. App. 3d at 270. In *Bogner*, the continuous use element was challenged by proof that the location of the claimed easement had materially changed during the prescriptive period, which the court found fatal. "We refuse to hold, as the defendants request, that moving the path over which you trespass 17 years after the trespass began and then beginning a new trespass over a totally different path which aggrieves totally different parties constitutes continuous use." *Id.* The court ruled that the location of the claimed easement path having been moved by nine feet precluded a finding that the element of continuous use to claim an easement by prescription had been proved. *Id.* An easement will not arise unless the use is " 'confined to a definite and specific line of way.' " *Id.* (quoting *Thorworth v. Scheets*, 269 Ill. 573, 582 (1915)).

¶ 41 Given the posture of this case, it is the defendants' burden to demonstrate that the trial court's finding of continuous use was against the manifest weight of the evidence. The evidence permits a fair inference from Sutton's testimony that the driveways were unaltered since approximately 1978, when he began his employment at the South Branch property when no testimony to the contrary was ever elicited. The finding that the locations of the driveways were unchanged since the start of the prescriptive easement period is also supported by the physical construction of the three driveways, two paved and the third with a gate across it. Unlike in *Bogner*, which the defendants cite in support of their challenge, our attention here is not directed to any evidence that affirmatively proved the line of way of the three easements was materially altered since 1978. *Bogner*, 343 Ill. App. 3d at 270 (proof that the path of the claimed easement had moved nine feet during the prescriptive period precluded a finding of continuous use).

¶ 42 We also decline to follow the adverse possession cases, which the defendants urge as controlling authority, in this case involving prescriptive easements. Adverse possession

-10-

involves a claim of ownership over the subject land. A claimant for adverse possession "must prove with reasonable certainty the location of the boundaries of the tract" over which he claims ownership. *Tapley*, 141 Ill. App. 3d at 404-05. This is so because a successful claim of adverse possession entitles the claimant to exclusive possession of the claimed land as an owner in fee simple.

¶ 43    In the instant case, however, ownership of the easements only gives South Branch[3] the right, for a *limited purpose*, to pass over or use the land of the defendants. *McMahon*, 298 Ill. App. 3d at 235. Establishment of the easements does not convey ownership by title. Although language in the adverse possession cases supports the defendants' contention that South Branch had to prove "the dimensions and locations of the claimed easements," we follow those cases that uphold a difference between the two interests with a corresponding variation in applicable principles. A prescriptive easement involves a "lesser interest" than the interest at stake in a claim of adverse possession. *Smith v. Mervis*, 38 Ill. App. 3d 731, 732 (1976). The difference between the two claims is best illustrated by the application of a presumption of adversity in an easement claim when the origin of the easement is unclear and the other elements have been proved, which as the defendants point out does not apply in a claim for adverse possession. "Where a way has been used openly, uninterruptedly, continuously and exclusively for more than a period of twenty years, the origin of the way not being shown, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located. This presumption of a grant or adverse right is *prima facie* merely and may be rebutted." *Rush v. Collins*, 366 Ill. 307, 315 (1937); see *Redella*, 365 Ill. App. 3d at 76; *Wehde v. Regional Transportation Authority*, 237 Ill. App. 3d 664, 668 (1992); *Schultz*, 148 Ill. App. 3d at 570 (all of which recognize that adversity may be presumed in the context of a prescriptive easement claim). We reject the defendants' contention that we should look to adverse possession cases in our review of a successful claim to prescriptive easements.

¶ 44    Nor are we persuaded by the defendants' claim that before continuous use may be found, evidence of the precise locations and dimensions must be adduced to prove the "extent" of the easements. Such precise proof of an easement is not required because "the extent of prescriptive use defines the easement." *Vallas v. Johnson*, 72 Ill. App. 3d 281, 284 (1979). An easement's actual use determines its width. *Peters v. Milks Grove Special Drainage District No. 1*, 243 Ill. App. 3d 14, 19 (1993) (lack of proof of location and width was not fatal to an easement claim; rather, in the absence of such proof, the easement is "limited to the extent of the [dominant estate's] prior actual use").

¶ 45    As we made clear above, the dimensions and locations of the driveways, with two paved and the third gated, cannot be seriously disputed. Exhibits showing the property are spread of record, some of which Sutton used during his testimony to identify the driveways without noting any relocation since the start of his work at the South Branch property in approximately 1978, the start of the prescriptive period. Even if South Branch had an additional burden as the defendants contend, there is sufficient proof spread of record of the

---

[3]As a matter of convenience, we use South Branch to include its predecessors in title.

dimensions and locations of the easements that connected the driveways, especially where the record is barren of any evidence that the location of the three easements had materially changed.

¶ 46    Proof of the locations and dimensions of the three easements, beyond that which is spread of record before us, was not required; nor did the absence of greater proof render the trial court's finding of continuous use for the requisite period against the manifest weight of the evidence.

¶ 47    The defendants next challenge the trial court's finding of exclusive use. To undermine this finding, the defendants argue that the railroad must have used the driveways concurrent with South Branch because "[c]ommon knowledge compels the conclusion that the railroad itself used whatever crossings there were to move men and materials to work on both sides of the roadbed." The defendants contend exclusivity was not proved, because, as *Redella* states, "exclusivity *** require[s] that the rightful owner be altogether deprived of possession." (Internal quotation marks omitted.) *Redella*, 365 Ill. App. 3d at 76. The defendants assert "not a shred of evidence [exists] that the [prior] owners of the ROW [right-of-way] were 'altogether deprived of possession.' " The defendants contend "that crossovers of the ROW were permissive from the start in 1880 to foster commerce on both sides of the tracks." The defendants claim that use was "permissive until the present controversy arose in the late 1990s."

¶ 48    The record discloses grants of easement in 1880 (Yale conveyance providing that businesses be "reasonably accommodate[d]" to cross railroad right-of-way), in 1919 (conveyance from Central Manufacturing District to Albert Pick referencing easements for the benefit of the now South Branch land), and in 1958 (express easements by Chicago Junction Railway to Central Manufacturing District, a predecessor in title to JS II) over the railroad right-of-way. We disagree, however, that these conveyances conclusively established that South Branch's use of the easements was not exclusive in this action in equity. See *Schmidt v. Brown*, 226 Ill. 590, 597 (1907) ("If appellant's contention is sustained, the result is that the agreement converts a user of about forty years, which might be the basis of a prescriptive right, into one under a license, thereby destroying any existing right acquired by past user and at the same time making it impossible to acquire any prescriptive right in the future. Manifestly, such was not the intention of the parties.").

¶ 49    In its rulings, the trial court distinguished between use of the actual railroad tracks and the use of the land over which the tracks were laid that connected the three driveways and constituted the easements. The trial court did not accept the defendants' argument that "common knowledge" compelled the conclusion that the easement portions of the right-of-way were used by the railroad at some point after 1978. Rather, the court addressed only the actual evidence presented at trial that trains crossed the tracks in the 1980s. The court ruled that if the trains crossed the tracks in the 1980s, as only Sutton testified, that use of the tracks did not preclude South Branch's showing of exclusive use of the driveway easements over the right-of-way. We find no basis to disagree with the finder of fact.

¶ 50    To overturn a finding of exclusivity, the contrary finding must be manifest. *Roller*, 16 Ill. App. 3d at 1053-54 ("findings of fact by trial court will not be disturbed unless they are

manifestly against the weight of the evidence").

¶ 51    Under the facts and circumstances of this case, where appurtenant easements were found to be established over a former railroad right-of-way, which connect driveways entirely on the dominant estate, the law does not require the railroad company to be literally deprived of possession of the tracks during the prescriptive easement period. *Wehde*, 237 Ill. App. 3d at 682 (it was error to grant summary judgment and direct a verdict in favor of the railroad company on prescriptive easement claims at railroad crossings). To literally deprive the railroad of possession of the tracks, as the defendants appear to contend, the claimant would have had to dismantle the tracks at the easements to demonstrate exclusive possession of the easements. The law does not compel such an absurd result. "It is necessary, under these circumstances, that the right of use for a particular purpose must carry with it all the intendments of such use. The very finding of a prescriptive right to use the space above another's land *** must carry with it the reasonable conclusion that the space below *** is also a part of the prescriptive right." *Poulos v. F.H. Hill Co.*, 401 Ill. 204, 218 (1948). "If a party can obtain title by adverse possession against a railroad he can acquire the lesser interest of a prescriptive easement." *Smith*, 38 Ill. App. 3d at 732.

¶ 52    Judge Mason, presiding over this action in equity, concluded the law required only that South Branch prove exclusive possession over the driveway portion of the easements. We find no fault with the trial court's ruling in the context of this bench trial. The court had to decide the ultimate factual question of whether South Branch proved prescriptive easements over the long-abandoned railroad passage. Under the facts and circumstances of this case, we cannot conclude that the judge's finding that South Branch exercised exclusive possession over the crossing of the right-of-way at the three driveways was against the manifest weight of the evidence; we reject the defendants' contention that they were entitled to a contrary finding, as a matter of law, on the element of exclusivity. See *Wehde*, 237 Ill. App. 3d at 681 ("not every slight or occasional use of the land, even by the owner, will constitute an interruption" to stop the running of the prescriptive period).

¶ 53    In *Wehde*, the trial court granted summary judgment to the Commuter Rail Division of the Regional Transportation Authority (Metra) in an action "claiming a prescriptive easement over a set of railroad tracks" owned by Metra. *Id.* at 668. The Second District rejected the trial court's reasoning "that it is impossible, as a matter of law, to obtain a prescriptive easement over a railroad right-of-way." *Id.* at 674. Ultimately, the appellate court concluded that summary judgment and a directed verdict were entered in error. It was for the trier of fact to determine whether the claimant could prove "adverse, open, notorious, and continuous use of the crossing by the owners of the [dominant estate] for the statutory period." *Id.* at 682. The court also ruled that the other prescriptive easement claimant had sustained "its burden of completing its *prima facie* case" to preclude a directed verdict. *Id.* The *Wehde* court remanded both claims to the trial court for further proceedings.

¶ 54    Consistent with the Second District's decision in *Wehde*, it was not "impossible, as a matter of law," for South Branch to prove exclusive use of what was a railroad crossing at the three driveways simply because a train or two traveled on the tracks on the right-of-way as late as the 1980s. "Exclusive use *** does not mean that no one may or does use the way except the claimant of the easement. It means no more than that his right to do so does not

-13-

depend on a like right in others ***." *Rush*, 366 Ill. at 314.

¶ 55    We find further support for the trial court's ruling in our belief that South Branch could not have been legally prevented from crossing the right-of-way at the location of the three driveways during the railroad's existence. In this sense, we reject the defendants' contention "that crossovers of the ROW were *permissive* from the start in 1880." (Emphasis added.) The factual question of the establishment of the prescriptive easements was for the trial court to answer. We are unpersuaded that the trial court's finding of exclusive use was contrary to the manifest weight of the evidence, especially where no testimony from the railroad owners of the right-of-way was ever presented. "It is also reasonable to suppose that the owner of the land would not have acquiesced in such enjoyment for so long a period, when it was his interest to have interrupted it, unless he felt conscious that the party enjoying it had a right and a title to it that could not be defeated." *Id.* at 315.

¶ 56    No evidence exists in the record that the railroad used that portion of the driveways that constituted the easements within the prescriptive period to overturn the fact finder's conclusion that South Branch had proved exclusivity to establish the easements.

¶ 57    The defendants next challenge the trial court's application of the presumption of adverse use. The trial court expressly found that "[t]he origin of the easements over the [right-of-way] is *** unclear." "[T]he presumption as to the permission to use depends upon the use of vacant and unoccupied and unenclosed land." *Poulos*, 401 Ill. at 215. In order to preclude the presumption under this rule, "the land not only must be unenclosed, but also must be vacant and unoccupied." *Id.* If the origin of an easement cannot be shown and the other elements to establish a prescriptive easement are proved, adverse use will be presumed, which simply means it "may be rebutted." *Rush*, 366 Ill. at 315 ("presumption of a grant or adverse right is *prima facie* merely and may be rebutted"). "Where property has been used in an open, uninterrupted, continuous, and exclusive manner for the required period, adversity is presumed and the burden shifts to the party denying the prescriptive easement ***." *Redella*, 365 Ill. App. 3d at 76.

¶ 58    In an attempt to rebut the presumption, the defendants argue that "[t]he trial court overlooked uncontradicted evidence of when the origin occurred and that it was permissive." The defendants cite three pieces of evidence supporting this position: (1) the 1880 Yale document, which required the railroad to reasonably accommodate businesses that would have to cross the yet-to-be-built tracks; (2) the testimony of Anthony Augustine, co-owner of South Branch, stating that he believed use of the driveways was with permission; and (3) the testimony of Marshall Snow–the agent who issued insurance over the easements to South Branch–that "back in 1880 and reiterated in 1958," there was permission to use the driveways.

¶ 59    However, the defendants successfully argued that the 1958 gap in title precluded South Branch from establishing easements by grant. We reject the defendants' argument that the trial court was compelled to accept the origin of the easements over the right-of-way as conclusively established by conveyances involving the right-of-way before 1958. Also, it is clear that the railroad right-of-way prior to 1958 was neither vacant nor unoccupied to permit the presumption that use was *permissive*. *Poulos*, 401 Ill. at 215. The trial court expressly

-14-

ruled that the origin of the easements was unclear. We are unpersuaded by the defendants that said finding was contrary to the manifest weight of the evidence. See *Schultz*, 148 Ill. App. 3d at 571 ("Based on the evidence presented to the trial court, we believe the first use of the way was not shown and, therefore, the facts admitted of a presumption that plaintiffs' use was adverse and not permissive.").

¶ 60        The defendants attack the rule of law that permits a presumption of adversity in favor of an easement claimant as "inconsistent with the principle of law in adverse possession cases that all presumptions are made in favor of the record title holder." As we made clear above, the presumption of adversity in certain prescriptive easement cases is well established in Illinois law. *Rush*, 366 Ill. at 315; *Redella*, 365 Ill. App. 3d at 76; *Schultz*, 148 Ill. App. 3d at 570; *Wehde*, 237 Ill. App. 3d at 678. The presumption reflects that an easement case differs from a case involving adverse possession; an easement claim involves a lesser interest in property. *Smith*, 38 Ill. App. 3d at 732. We follow those cases that hold that a presumption of adversity arises in prescriptive easement cases when the origin of the easement is unclear and the other elements have been proved.

¶ 61        The evidence marshaled by the defendants did not preclude the trial court's ultimate finding of prescriptive easements. See *Petersen v. Corrubia*, 21 Ill. 2d 525, 534 (1961) ("Another very compelling reason why we think the decree entered herein [granting a prescriptive easement] is equitable and proper, is that even though the mutual use of disputed areaway did not ripen into an easement, this court will not permit the owner of the property to revoke a license if in doing so it will operate as a fraud."). The record as it stands before us, with the benefit of a thorough memorandum opinion from the trial judge serving as trier of fact, does not compel a conclusion contrary to the one reached below. Judge Mason concluded that South Branch's crossing of the right-of-way at the three driveways on its property "invested the plaintiff with an easement by prescription." *Petersen*, 21 Ill. 2d at 534. We have no doubt that the court in equity reached the right result. See *Petersen*, 21 Ill. 2d at 534 (the granting of a prescriptive easement was upheld as "equitable and proper").

¶ 62                                            *Statute of Limitations*

¶ 63        The defendants contend that even if the trial judge's verdict that South Branch owns easements at the intersection of the right-of-way with the three driveways is not against the manifest weight of the evidence, South Branch's 2002 claim came too late. In an argument reminiscent of their challenges to the easement elements, the defendants assert the claim of easements was barred by the 40-year statute of limitations because the "evidence in this case is uncontroverted that the origin of the ROW and easements to cross over the ROW stem from a deed recorded in 1880." See 735 ILCS 5/13-118 (West 2010). The defendants also note other evidence in the record that points to "the start of the use of crossovers" in 1885 and as late as 1911, when the warehouse was built on what is now the South Branch property. The defendants assert: "If the trial court, as finder of fact, can assume that South Branch and its predecessors in title used crossovers under claims of right adverse to the successive owners of the ROW for 20 years before 1999, there is nothing in the record that warrants starting the adverse claim in 1978." In light of the deference owed to the findings

of the trial court as trier of fact, we disagree.

¶ 64 In its 2002 complaint, South Branch claimed easements by grant at the driveways based on the 1880 Yale document, the related 1885 document, and the 1919 document conveying what is now the South Branch property. The defendants, however, challenged South Branch's privity with prior owners of the property to establish its right to cross the right-of-way at the three driveways based on express easements. The defendants claimed that a gap in the chain of title in 1958 precluded South Branch from claiming the express easements were granted prior to 1958. The trial court agreed. With South Branch precluded from establishing express easements in light of the 1958 gap in title, the trial court ruled that the very same gap in title meant the statutory period for the claim of prescriptive easements could have begun no earlier.

¶ 65 We reject the defendants' efforts to use the gap in title first as a shield against a finding of express easements and then, by disregarding the gap, in an effort to strike down South Branch's 2002 complaint as untimely. See *Petersen*, 21 Ill. 2d at 534 (granting a prescriptive easement was "equitable and proper" under the circumstances). In its memorandum opinion and order of December 19, 2006, the trial court ruled the statute of limitations "has no applicability under the circumstances presented here. The evidence in this case relates to use of the three driveways by South Branch and its predecessors beginning in the late 1970's, which ripened into prescriptive easements prior to defendants' acquisition of the ROW."

¶ 66 We are unpersuaded that the trial court erred when it rejected the defendants' argument that the prescriptive easement claim ripened much earlier and that the statute of limitations barred South Branch's claim for prescriptive easements filed in 2002.

¶ 67 *Injunctive Relief*

¶ 68 The defendants claim that the trial court's issuance of the injunction barring them from "interfering with [South Branch's] use of the easements" was improper because it impermissibly infringed upon JS II's rights arising from its ownership of the right-of-way. The defendants correctly assert that ownership of easements does not give South Branch ownership rights to the exclusion of the defendants. The defendants assert that the wording of the injunction, which " 'enjoins defendants *** from trespassing upon and damaging South Branch's easements,' " nevertheless improperly restricts their use of the right-of-way in favor of South Branch's use. In support of the contention of error, the defendants point to the trial court's reliance, in its amended memorandum opinion and order, on "the common law definition of trespass as an 'invasion of the interest in exclusive possession of land.' " The defendants read the language of the injunction as giving South Branch "the right to exclusive possession" of the easements. We disagree with the defendants' reading of the injunction.

¶ 69 The trial court's use of the word "trespass" was directed at the interests South Branch has in the easements. The owner of an easement has the right of use of the easement, which encompasses "use that is reasonably necessary for full enjoyment of the premises." *McMahon*, 298 Ill. App. 3d at 236. The injunction bars the defendants from trespassing upon South Branch's use of that portion of the right-of-way to ensure uninterrupted access to the

-16-

driveways. The trial court apparently used the word "trespass" because the defendants did precisely that when they excavated a trench along the right-of-way, rendering one driveway unuseable, and which also encroached upon South Branch's property. The defendants' contention that no "unreasonable interference" with the easements occurred is entitled to no serious consideration in light of these findings by the trial court. The trial court also concluded that the defendants "used their interest in the [right-of-way] as another means of putting pressure on South Branch to sell a portion of its property to defendants." The "trespass" language was meant to send a clear message to the defendants that future breaches of South Branch's easement rights would constitute a violation of the injunction. However, the injunction in no way precludes the defendants from accessing the right-of-way at points where it intersects with the driveways so long as South Branch's easement rights are not interfered with by the defendants' use of their property.

¶ 70	We reject the defendants' reading of the injunction as giving South Branch "exclusive possession" of the right-of-way at the three driveways. We also reject JS II's complaint that it "cannot know when it is 'trespassing' and when it is not" because the precise locations and dimensions of the easements were not included in the final judgment. As we ruled above, the locations and dimensions of the easements are plain enough.

¶ 71	The trial court's decision to issue the permanent injunction was not against the manifest weight of the evidence. *In re Estate of Ramlose*, 344 Ill. App. 3d 564, 573 (2003). The issued injunction is reasonable and not overly broad. See *Tsuetaki v. Novicky*, 158 Ill. App. 3d 505, 514 (1983) ("An injunction should be reasonable and should only be as broad as is essential to safeguard the rights of the plaintiff.").

¶ 72	*Monetary Damages*

¶ 73	Finally, the defendants argue that the trial court erred in awarding South Branch nominal damages in the amount of $2,000 because no authority exists "for assuming damages in favor of an easement owner when there is no evidence of damages." The defendants also challenge the punitive damages award of $10,000, premised on their claim that South Branch sustained no actual harm and that they never acted in bad faith.

¶ 74	South Branch responds that the defendants forfeited several of these arguments by failing to raise them before the trial court. South Branch argues that in any event nominal damages are appropriate in any instance of trespass, even in the absence of proof of actual damages, and that the award of punitive damages is amply supported by the evidence.

¶ 75	Because the issue of damages was raised in the defendants' posttrial motion, we address the merits of the defendants' challenges to the damages awarded. A trial court's order imposing nonpunitive damages is reviewed for an abuse of discretion; a finding of trespass is reviewed against the manifest weight of the evidence. We understand the defendants also challenge the trial court's legal authority to impose nominal damages for trespass, which as a question of law is reviewed *de novo*. *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 254-55 (2003) (questions of law are reviewed *de novo*).

¶ 76	In the context of easements, trespass occurs when there is a material interference with the right of the owner of the dominant estate to reasonable use of the easement. *McMahon*, 298

-17-

Ill. App. 3d at 239. A party is liable for trespass when he intentionally intrudes upon the land of another. *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 553-54 (1980). A servient estate owner may maintain, improve, or use his property that constitutes the easement only in any way that is consistent with the dominant estate owner's enjoyment of the shared land. *McMahon*, 298 Ill. App. 3d at 239. What constitutes unreasonable interference by the owner of the servient estate is a question of fact. *Id.*

¶ 77     Contrary to the defendants' contention, a plaintiff need not prove actual harm to recover damages for trespass; trespass occurs whenever property interest is invaded. In fact, "every trespass entitles the plaintiff to at least nominal damages." *Johnson v. Tipton*, 103 Ill. App. 3d 291, 296-97 (1982).

¶ 78     The record establishes that the defendants trespassed on South Branch property on January 5 and 7, 2002, when they excavated the right-of-way, making one of the driveways impassable, at least temporarily. The trial court found that during the excavation, the defendants strayed beyond the boundaries of the right-of-way and onto the South Branch property. The trial court found the excavation constituted a trespass. Although the trial court found no actual damages had been proved, it awarded nominal damages based on its finding that the excavation constituted an unreasonable interference with an easement and breached the South Branch property.

¶ 79     The defendants maintain that they committed no trespass as they placed metal plates over the trench they dug on the right-of-way to permit continued use by traffic of the driveway. The defendants appear to argue that a servient estate cannot be found to have trespassed against its own property. They also note that at the time of the excavation, South Branch's ownership of the easements had not been legally established. We reject each argument.

¶ 80     The trial court found that the driveway was rendered impassable for a period of time. We defer to the trial court on issues of fact. See *McMahon*, 298 Ill. App. 3d at 239-40 ("As no precise rule can be stated as to when the use by the owner of the servient or dominant estate is a reasonable use as distinguished from an unreasonable use, it is a question of fact to be determined from the facts and conditions prevailing.").

¶ 81     Nor are we presented with any authority that requires a judgment be entered declaring the existence of the easements before the owner of the servient estate can be found to have interfered with the dominant estate's use of an easement. Prescriptive easements are not *created* by judicial edict; a legal judgment merely *establishes* that a prescriptive easement exists or not. The action in the instant case confirmed that South Branch owned easements since approximately 1998, when the prescriptive period was satisfied. We also note, the defendants recorded an objection to South Branch's crossing of the right-of-way in 2000, which makes clear that the defendants were aware of South Branch's putative claim of easements at the crossing of the right-of-way at the three driveways. As a matter of law, an unreasonable interference to an easement may trigger an award of nominal damages to the owner of the dominant estate. *McMahon*, 298 Ill. App. 3d at 239.

¶ 82     We are also unpersuaded that a finding of unreasonable interference with the use of an easement by the defendants, as owners of the servient estate, should not result in the award of nominal damages to the owner of the dominant estate where the easements were either

-18-

paved or gated and in daily use. See *Johnson*, 103 Ill. App. 3d at 296-97 ("every trespass entitles the plaintiff to at least nominal damages"). In the language of trespass, an owner of the dominant estate has the right of use of the easement to the exclusion of the owner of the servient estate when its intended or actual use unreasonably interferes with the dominant estate's use. It is in this sense that reasonable use by a dominant estate may be "exclusive" to the use of the easement by the owner of the servient estate. *Peoples Gas Light & Coke Co. v. Joel Kennedy Construction Corp.*, 357 Ill. App. 3d 579, 583 (2005). The trial court so ruled: "Even if the defendants were attempting to improve their own property, as the servient owners, they can only use the [right-of-way] for a purpose consistent with *** South Branch's enjoyment of its easements." It is beyond contention that rendering an easement, used as a driveway, unpassable is an unreasonable interference and therefore a trespass.

¶ 83     The trial court did not err in awarding South Branch nominal damages for the defendants' interference with the use of one of three easements.

¶ 84     In their challenge to the award of punitive damages to South Branch, the defendants argue they did not act in bad faith and no actual harm was sustained by South Branch, which they contend precludes a finding of willful wrongdoing.

¶ 85     Generally, punitive damages are awarded when the underlying tort is accompanied by aggravating circumstances such as willful, wanton, malicious, or oppressive conduct. *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 253 (2006). "Punitive damages are not awarded as compensation, but instead serve to punish the offender and deter him and others from committing similar acts of wrongdoing in the future." *Id.* The decision to grant punitive damages is a question of law, which we review *de novo*. *Id.*

¶ 86     The trial court found that the defendants' trespass was both intentional and malicious, committed with the aim of pressuring South Branch to sell a portion of its property. The trial court awarded $10,000 in punitive damages to punish and deter the defendants from engaging in similar conduct. The defendants' clear desire to force their will upon South Branch, as the trial court found, persuades us that the trial court did not err in concluding that the defendants needed to be deterred from similar acts of wrongdoing. We also agree with the trial court's observation that the defendants have no real use for the right-of-way that crosses the South Branch property, which supports its finding of bad faith.

¶ 87     In an effort to demonstrate good relations with its neighbor and a legitimate purpose behind the excavation, the defendants point to the agreed order of January 11, 2002, between the parties allowing the defendants to excavate the right-of-way, which the defendants assert was never violated. However, the punitive damages were awarded for trespasses on January 5 and 7, 2002, which the defendants committed without regard to neighborly relations, even though they were aware of South Branch's daily crossing of the right-of-way no later than January 2000, when they recorded their postclosing objection. The belated agreement did not wipe away the defendants' earlier transgressions.

¶ 88     The defendants' argument that punitive damages cannot be awarded absent an award of actual damages is simply wrong as a matter of law. While an award of punitive damages cannot stand alone, an award of nominal damages can support the assessment of punitive damages in the case of an intentional tort. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 133

(2008); *Hoellen*, 367 Ill. App. 3d at 252. Trespass is an intentional tort. *Peoples Gas*, 357 Ill. App. 3d at 583. As such, the trial court did not err in awarding punitive damages.

¶ 89                                    South Branch's Appeal

¶ 90                            *Reinstatement of Ownership Claim*

¶ 91    In its cross-appeal, South Branch argues that the trial court erred in not reinstating its claim to ownership of the right-of-way by operation of reversion. South Branch voluntarily dismissed this claim a few months after it filed the complaint in 2002. Notably, JS II filed a counterclaim asserting ownership of the right-of-way after South Branch dismissed its ownership-by-reversion claim, which placed the issue of ownership squarely before the trial court. Arguing that reinstating a claim is akin to refiling a still viable claim after voluntarily dismissing it, South Branch contends the trial court erred as a matter of law when it failed to permit reinstatement.

¶ 92    Generally, a party that voluntarily dismisses a complaint or a portion of a complaint has a right to refile it if the time for commencing the action has not expired. 735 ILCS 5/13-217 (West 1994). When the plaintiff has voluntarily dismissed a claim or count of a complaint, the plaintiff may request leave to reinstate the dismissed claim before the same trial court. In cases involving multiple parties or multiple claims, the court may allow reinstatement by vacating the original voluntary dismissal order. *Ryan v. School District No. 47*, 267 Ill. App. 3d 137, 141 (1994). In such a case, the decision to vacate the dismissal order is at the discretion of the trial court, which triggers a review for an abuse of discretion. *Kalalinick v. Knoll*, 97 Ill. App. 3d 660, 664 (1981). We decline South Branch's invitation to review *de novo* Judge Mason's decision to deny reinstatement.

¶ 93    The record amply supports Judge Mason's exercise of her discretion in denying South Branch's motion to reinstate. She pointed out that the parties had already completed a bench trial and had adduced evidence and framed their arguments based on the claims then pending. To permit reinstatement of a claim dismissed nearly four years earlier would have resulted in unfairness to the defendants. The trial court did not abuse its discretion in denying South Branch's reinstatement bid.

¶ 94                                *Dismissal of Complaint*

¶ 95    South Branch claims an absolute right to litigate the complaint that Judge Agran dismissed with prejudice as duplicative of the issue before Judge Mason. 735 ILCS 5/2-619(a)(3) (West 2008) ("another action pending between the same parties for the same cause" is a ground for involuntary dismissal).

¶ 96    JS II counters that South Branch's claim of error based on Judge Agran's dismissal of its ownership-by-reversion claim was rendered moot by the final judgment in the bench trial that JS II owned the right-of-way by conveyance of title from ConRail. That ruling became final when South Branch failed to appeal it. *Panhandle Eastern Pipe Line Co. v. Environmental Protection Agency*, 314 Ill. App. 3d 296, 304 (2000) (when no appeal is taken, judgment becomes final after 30 days). JS II argues that Judge Mason's final order regarding ownership

of the right-of-way forecloses review of South Branch's contention that Judge Agran's dismissal trampled upon its absolute right to refile its claim under section 13-217 of the Code. 735 ILCS 5/13-217 (West 2010).

¶ 97    A party that voluntarily dismisses a complaint or a portion of a complaint has a right to refile within one year so long as the action is not barred by the statute of limitations. 735 ILCS 5/13-217 (West 2010). "[S]ection 13-217 grants a plaintiff the absolute right to refile a dismissed complaint," which a court "may not infringe upon." *Case v. Galesburg Cottage Hospital*, 227 Ill. 2d 207, 215 (2007).

¶ 98    However, our jurisdiction is limited to actual controversies where a grant of relief is possible. "Appellate jurisdiction is contingent upon the existence of a real controversy ***." *Midwest Central Education Ass'n v. Illinois Educational Labor Relations Board*, 277 Ill. App. 3d 440, 448 (1995). When no relief can be granted on the claimed controversy, the issue is considered moot. *Id.* "An issue is 'moot' where its resolution could not have any practical effect on the existing controversy." *Id.* "[W]here only moot questions are involved, this court will dismiss the appeal." *Id.*

¶ 99    South Branch sought to claim ownership of the right-of-way by way of reversion, triggered by the abandonment of the railroad right-of-way. See *Schnabel*, 101 Ill. App. 3d at 558 ("The abandonment by the railroad of the right-of-way for railroad purposes revests the owner of the record title with absolute ownership of the land upon which the right-of-way had existed.").

¶ 100   It appears title in the right-of-way land was granted to a railroad company in the 1885 Yale conveyance. According to South Branch's brief, the railroad right-of-way was abandoned in 1984. However, JS II proved that it acquired title to the right-of-way land from ConRail no later than 1998. South Branch did not purchase its adjacent parcel until 1999, by which time title in the right-of-way vested in JS II. In light of the manner through which JS II acquired ownership of the right-of-way, it is not surprising that South Branch voluntarily dismissed its ownership-by-reversion claim shortly after it filed its complaint. South Branch, nonetheless, sought to reinstate its claim before Judge Mason. When its motion, filed after trial had concluded, was denied, South Branch filed a new complaint asserting the same claim. Judge Agran dismissed the complaint with prejudice based on the ownership claim then pending before Judge Mason. Judge Mason ultimately ruled that JS II owned the right-of-way in fee simple by passage of title from ConRail. This ruling became a final and unassailable judgment when South Branch failed to challenge it on appeal.

¶ 101   Given Judge Mason's ruling, reversing Judge Agran's order to give effect to South Branch's right under section 13-217 of the Code to file its reasserted claim, would be pointless. South Branch would be barred by *res judicata* from challenging JS II's title based on a contention that abandonment of the railroad right-of-way precluded good title from passing to JS II from ConRail. When South Branch did not appeal Judge Mason's ruling that JS II held good title, it rendered moot any ownership claim that South Branch could assert over the right-of-way.

¶ 102                                    CONCLUSION

¶ 103        In appeal No. 1-07-0212, it was not against the manifest weight of the evidence for Judge Mason to decide that South Branch owned prescriptive easements at each location where the former railroad right-of-way crossed and connected three driveways on the South Branch property. Nor was the prescriptive easement claim filed in 2002 barred by the statute of limitations. The trial court did not abuse its discretion in enjoining the defendants from future unreasonable interference with South Branch's use of the three easements. The trial court did not abuse its discretion in awarding South Branch $2,000 in nominal damages where the evidence proved trespass, albeit proof of actual harm was not introduced. The trial court did not err in assessing $10,000 in punitive damages where nominal damages were properly awarded and punitive damages were necessary to punish bad-faith conduct by the defendants in excavating the right-of-way and to deter any similar wrongdoing in the future. Finally, the trial court did not abuse its discretion in denying South Branch's motion to reinstate its claim for ownership of the right-of-way by reversion, which it filed after trial had concluded but before judgment was issued, and the court ruled reinstatement would have been unfair to the defendants.

¶ 104        South Branch's appeal in No. 1-06-3240 is dismissed. South Branch's contention that it had the absolute right to refile its ownership-by-reversion claim over the right-of-way was rendered moot by Judge Mason's decision that JS II owns the right-of-way, which South Branch did not appeal.

¶ 105        Affirmed.

-22-