EMMA McCREARY *vs.* BOSTON AND MAINE RAILROAD.

Suffolk.    January 16, 1891. — February 26, 1891.

Present: FIELD, C. J., W. ALLEN, C. ALLEN, HOLMES, & MORTON, JJ.

*Railroad — Public Right of Crossing by Prescription — Adverse User*
*— New Trial.*

Acts of crossing a railroad with carriages or on foot, at what was originally a private farm crossing established by agreement for the convenience of the owner of land on both sides of the railroad, must, in order to establish a public prescriptive right to cross thereat, be adverse and exercised as of right, and so sufficient in number, character, and extent of time as fairly to show that they were not merely incidental to the private right of crossing, but were in the assertion and exercise of a public right.

If a case is submitted to the jury under instructions which permit them to find a verdict which the evidence is not sufficient to sustain, the other party is entitled to a new trial, although the instructions, abstractly considered, are free from objection.

TORT, by the administratrix of the estate of Elisha McCreary, for causing his death upon the Eastern Division of the defendant's railroad. Writ dated October 24, 1889. Trial in the Superior Court, before *Staples*, J., who allowed a bill of exceptions, which, so far as material to the points decided, is as follows.

The intestate, while in the act of crossing the defendant's railroad at the Eastern Avenue crossing, so called, in Swampscott, fell down between the rails in an epileptic fit, and was run over and instantly killed by an express passenger train of the defendant. The travelled way called Eastern Avenue approached the westerly side of the defendant's location at the crossing in question, but had not been laid out over it. The plaintiff contended that the public had acquired a right by prescription to use such crossing, and upon this point the evidence was as follows.

One Phillips, called as a witness by the plaintiff, testified, on direct examination, that he was a resident of Lynn, and had been familiar with the Eastern Avenue crossing a good many years; that the Eastern Railroad was first operated about fifty years ago; that the parcel of land where this crossing is situated was divided by the railroad when it was constructed, and was subsequently owned by his (witness's) brother; that a crossing

was built on each side of the railroad bed three or four feet
higher than the level of the adjacent land; that a filling was
made on each side and planks placed between the rails by the
Eastern Railroad Company; that there was a good grade on
each side to get upon the railroad, and that about 1878 the
planking was removed; that the public used this crossing from
1838 to 1875; that they hauled manure across there; that he
had seen " teams go across there after they took the planking up;
there could n't anything but light teams go across; there was no
other way to get across "; and that " a year ago no team went
across there, because they could not go; the railroad dug a trench
on each side of the two tracks so we could not go across with a
team; foot passengers went across there; foot passengers have
been going across since the railroad was cut there in 1838;
teams ceased crossing about a year ago when the trench was
dug; prior to that, teams had been going across all the time
since the railroad was laid out."   On cross-examination, he tes-
tified that Graves, the owner of the land when the railroad
crossed the parcel, made some arrangement with the company
by which he should be allowed to go back and forth between his
two pieces of land; that Graves was a farmer, and used to haul
manure across to put on his crops; that he remembered a fence
along the line of the railroad, across what is called Eastern
Avenue, on one side, with a gate in it, put there by his (wit-
ness's) brother to prevent cattle from getting upon the land;
that that gate was kept shut; that Graves had bars on one side
that he kept up, and that his brother, the subsequent owner
of the property, kept bars there, but people kept taking them
down, and cattle got in, and then he put up a gate; that within
a few years the railroad had dug trenches on both sides of the
road, — deep ditches, — too deep for a team to get across; that
foot people could go across well enough; that the trenches kept
filling up; that during the last four or five years the defendant
had repeatedly erected palisades along the line of its location
and across the ends of the avenue, but the witness had taken
some of them down; that for some time its agents had done
what they could to obstruct travel there; that Eastern Avenue
has not been worked as a highway upon the eastern side of the
railroad; that the land there constitutes a part of the witness's

farm, and is open country, — merely level land; that, in spite of the obstructions of the railroad company, there is no trouble for a foot passenger to go over the road; and that, if a man wishes to cross at this spot, he can struggle over.

Owen Gaffney, called by the defendant, testified that he was section-master, having charge of the section of the railroad which included the Eastern Avenue crossing; that he had had charge of the section since 1850; that Graves and other parties went through to the narrow piece that was on the other side of the track; that there was one piece cut off from Graves's farm by the road; that, when the bars were down, some little market wagons would go across there; that during the last forty years there were gates in the first place, and Graves used to keep the gates locked; that he could not say how long gates or bars had been there, but that when the gates were rotted down, bars were put up; and that, after the bars, posts made of sleepers were set up.

On cross-examination, he testified that for the forty years that he had known this place people had been going back and forth over it, by climbing the fence; that when there was no fence there, he and his men would nail it up and fix it as soon as they could; that for forty years people had been going to this farm; and that he never knew any team to go there but Mr. Graves's team for his farming use. Then followed the question put to him, " In forty years? " to which he replied: " O, no, not forty years; twenty-five years after we had the boarded gates. The people went the same as he did, as far as the land was concerned, but there was no through right of way there; the people would keep going across, the same as they will anywhere; the street was graded, but there was a high knoll on each side coming to the track, very high; there was a temporary grade; there was no grading for people to go over, because there was no right to go there; that he supposed Mr. Graves kept it graded for his own purposes."

Other testimony was introduced by the defendant, to the effect that obstructions had been erected by the railroad company during the last four or five years.

The judge refused to rule, as requested by the defendant, that there was no evidence which would authorize the jury to find that the plaintiff's intestate was rightfully upon the defendant's

premises, but as to the prescriptive right acquired by the plaintiff as one of the public, instructed the jury, among other things, as follows:

" The plaintiff cannot recover, unless the deceased was rightfully crossing the track at the time of the accident, in the exercise of such prescriptive right. . . . A prescriptive way, or a way by prescription, may be acquired over a railroad. There are certain requirements to the acquisition of such a way. In the first place, what sort of use gives rise to the acquisition of this right of way? It may be defined as the public use of a way, as a way, actual, general, adverse, continuous, and uninterrupted for more than twenty years. What is an actual use needs no definition, and the same is true of a general use ; but the word 'adverse' may suggest different thoughts to different minds. [Here followed a quotation from the opinion in the case of *Deerfield* v. *Connecticut River Railroad*, 144 Mass. 325, beginning with the words near the top of page 338, " To acquire a right of way," etc., and concluding with the paragraph, which quotation the judge stated he adopted as the definition of "adverse."] So that the user must be actual, general, adverse ; it must also be peaceable, continued, uninterrupted, on the part of the public, for more than twenty years. Now here was a crossing that was constructed in 1838 ; there was planking put down at that time, and there was a grading up upon each side to the level of the railroad, and the claim is on the part of the plaintiff that a prescriptive right of way was acquired by the lapse of more than twenty years between the time when the kind of user to which I have referred began and its discontinuance. In 1878, or somewhere near that time, the planking was removed, and then, four or five years ago, the palisades were driven down or put down, and they were from time to time removed and renewed, and about a year ago there were trenches cut upon each side, by which travel by carriages was effectually stopped. The statement is, that after the removal of the planking light carriages still continued to go over there, and that after the palisades were put down, or after these posts were put down, there was foot travel still going there. But this is the point. Was the right acquired before the railroad took up the planking, before the railroad put down the posts, before the railroad cut the trenches? Had the right

been acquired by the public by prescription before 1878, by the user to which I have referred, to use that crossing for the purposes of public travel? If the right was acquired, it could not be taken away by interruptions and by obstructions put there afterwards by the railroad. If the right was acquired, it cannot be taken away by or destroyed by any acts such as have been shown here; but it is for you to consider all these acts as bearing upon the question whether there has been any acquisition of the right."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*S. Lincoln*, for the defendant.

*C. G. Fall*, (*F. N. Nay* with him,) for the plaintiff.

C. ALLEN, J. If the plaintiff's intestate was on the defendant's track without right, the action is not maintainable, unless there was wilful or reckless misconduct on the part of the defendant, or of its agents. *Wright* v. *Boston & Albany Railroad*, 142 Mass. 296, 301, and 129 Mass. 440. The plaintiff contended that at the point where her intestate was killed the public had acquired, by prescription, the right to cross the tracks of the defendant. The defendant requested the court to rule that there was no evidence which would authorize the jury to find that he was rightfully upon the track. The court declined to give this ruling, but instructed the jury, upon this branch of the case, that the plaintiff could not recover, unless the deceased was rightfully crossing the track at the time of the accident, in the exercise of such prescriptive right, and submitted this question to the jury under instructions which appear to be unobjectionable in matter of detail, if the evidence was sufficient in law to sustain the burden of proof resting upon the plaintiff to establish a public right of crossing. This presents the principal question to be determined.

Upon an examination of the testimony, we are constrained to the conclusion that it did not warrant a finding of such public prescriptive right. It was necessary for the plaintiff to show that there was a public use, continued uninterruptedly for the requisite length of time, which was adverse and under a claim of right, and not merely a use which was tolerated or permitted by the railroad company. Professor Washburn says, "The real

point of distinction is between a tolerated or permissive user, and one which is adverse or as of right." Washburn, Easements, (4th ed.) 86. The burden of proof upon this point being upon the plaintiff, it was incumbent on her, not merely to show an occasional use by persons who had no right to cross the track at that place, but a use which, in addition to other necessary elements, was adverse and exercised as a matter of right. *Sargent* v. *Ballard*, 9 Pick. 251, 256. *Smith* v. *Miller*, 11 Gray, 145, 148, 149. It is not necessary that a claim of right should be asserted in express terms. It may be inferred, provided the circumstances are sufficient to warrant such an inference. *Blake* v. *Everett*, 1 Allen, 248. *Barnes* v. *Haynes*, 13 Gray, 188. But the fact must exist that the public used the crossing as a matter of right.

The fact that at the outset there was at a particular point on a railroad track merely a private farm crossing, established by agreement for the convenience of the owner of the land upon both sides of the railroad, would not be decisive to show that such crossing might not in the course of time become a public way by prescription. *Weld* v. *Brooks*, 152 Mass. 297. Such a fact, however, when it is found to exist, suggests an explanation of any occasional crossing by other persons which may be shown, and naturally leads to a more careful examination of testimony, to see whether such acts of crossing appear to have been really adverse. Moreover, such acts of crossing at an early period in the history of railroads, when trains were comparatively infrequent and slow, and when greater freedom was tolerated in being upon railroad tracks than is now consistent with safety or prudence, would perhaps have less significance than similar acts would have at present. Under such circumstances, especially, something further than occasional unopposed acts of crossing must be shown in order to establish a public right of crossing. The acts of crossing must be such in number, character, and extent of time as fairly to show that they were not merely incidental to the private right of crossing, but that they were in the assertion and exercise of a public right. Ordinarily, of course, the question must be submitted to a jury whether a public use of this character, and of the required duration of time, has been shown. But in the present case, after the best consideration we can give to the subject, all the facts testified to seem to be con-

sistent with the view that there was merely a private crossing, which strangers to the right were allowed more or less to use.

The testimony of the witness Phillips was nearly all that there was in the case bearing upon this view. His testimony upon the matter now important to be considered was very general and vague. According to his account, when the railroad was built, about fifty years ago, Graves, who was the owner of the land on both sides of the track, made an arrangement with the railroad company for a private crossing; and a crossing was accordingly built, being graded up to the level of the track, and planks were placed between the rails by the company. He had bars on one side of the railroad, which he kept up. . The brother of the witness subsequently became the owner of the land; at what time is not stated. He also kept the bars there, but people kept taking them down, and then he put up a gate. The gate was kept shut. The Eastern Avenue, as the way approaching the railroad is called, has not been worked as a highway upon the eastern side of the railroad; the land there now constitutes a part of the farm of the witness, and is open country, — merely level land. The planking between the rails was removed by the railroad company ten or twelve years ago, and recently all travel by teams has been cut off. He says, indeed, "Prior to that, teams had been going across all the time since the railroad was laid out." This is not merely the strongest expression he uses, but almost the only one of significance as tending to show an adverse public use by teams. It stands virtually alone, without mention of any of the persons who thus crossed, or of their number, or of the frequency of their using the crossing, or of their destination or purpose. It was a case of persons going through bars or a gate, with no highway worked upon one side of the track, the land there being farm land, open country, merely level land, — with no evidence of any repairs on either side of the railroad at the public expense, or of any public action whatever in respect to the crossing or the approaches thereto, — with no assertion of right on the part of anybody to cross either the railroad or the land of the private owners on the sides thereof. There was nothing to show any great amount of crossing by others than those entitled to use the private crossing, or that such crossing was acquiesced in by the railroad company as a matter of right.

There being a crossing properly open to some persons, an occasional crossing by others, if known to the railroad company, is more consistent with permission or toleration than with the supposition that it was done and acquiesced in as a matter of right.

The witness Gaffney, the defendant's section-master, testified that, " when the bars were down, some little market wagons would go across there "; that " during the last forty years there were gates in the first place, and Mr. Graves used to keep the gates locked"; that " when the gates were rotted down, bars were put up; after the bars, posts made of sleepers were set up "; that " for forty years people had been going to this farm"; and that " he never knew any team to go there but Mr. Graves's team for his farming use."   " In forty years? "   " O, no, not forty years; twenty-five years after we had the boarded gates. The people went the same as he did, as far as the land was concerned, but there was no through right of way there; the people would keep going across, the same as they will anywhere; the street was graded, but there was a high knoll on each side coming to the track, very high; there was a temporary grade; there was no grading for people to go over, because there was no right to go there; he supposed Mr. Graves kept it graded for his own purposes."   This does not essentially vary or add to the testimony of Phillips in reference to the use being adverse.

The crossing by persons on foot did not appear to have been of a different character.   That a private way for travel on foot across a railroad track may be gained by prescription has been recently determined.   *Fitchburg Railroad* v. *Frost*, 147 Mass. 118.   Nor need it be doubted that a public footway may be thus acquired, like other public ways.   *Fitchburg Railroad* v. *Page*, 131 Mass. 391.   But the same difficulty remains, that it did not sufficiently appear that the crossing on foot was under a claim of right.   The physical fact of more or less crossing was undoubtedly shown.   But the evidence failed to show that this crossing was of such a character, and under such circumstances, as to warrant the jury in finding, or assuming, that a prescriptive right was thereby acquired.   In this respect the case bears some analogy to *Markey* v. *Mutual Benefit Ins. Co.* 103 Mass. 78, where a transfer of the manual possession of a policy was shown, but the court held, under the circumstances which there

existed, that this was insufficient to warrant the jury in finding a delivery with intent to pass the title. The same rule prevails in respect to the delivery of deeds. *Stevens* v. *Stevens,* 150 Mass. 557, and cases there cited.

It being incumbent on the plaintiff to establish by a preponderance of the testimony that the use of the crossing by others than those who rightfully used it as a farm crossing was adverse, and in the assertion of a right, if all the testimony was equally consistent with the theory that the use was not of that character, the plaintiff has failed to sustain the burden which rested upon her. *Lamb* v. *Western Railroad,* 7 Allen, 98. *Smith* v. *First National Bank in Westfield,* 99 Mass. 605. *Griffin* v. *Boston & Albany Railroad,* 148 Mass. 143, 145, and cases there cited. And if a case is submitted to the jury under instructions which permit them to find a verdict which the evidence is not sufficient to sustain, the other party is entitled to a new trial, although the instructions, abstractly considered, were free from objection. *Brightman* v. *Eddy,* 97 Mass. 478. *Markey* v. *Mutual Benefit Ins. Co.* 103 Mass. 78, 87. *King* v. *Nichols,* 138 Mass. 18, 23.

The entry must be,                    *Exceptions sustained.*