JOHN F. THORWORTH *et al.* Plaintiffs in Error, *vs.* JOHN SCHEETS *et al.* Defendants in Error.

*Opinion filed October 27, 1915.*

1. PRACTICE—*effect of motion to dismiss bill for want of equity.* A motion by the defendants to dismiss a bill to enjoin the obstruction of an alleged alley, made at the close of the complainants' evidence, is not considered proper practice, but it amounts to nothing but a submission of the case to the chancellor on the merits.

2. HIGHWAYS—*what necessary to determination of question of highway by prescription.* In order to determine whether an alleged street or alley is a public highway by prescription, it must be decided whether the same has been used by the public as such highway for the period named in the statute.

3. SAME—*effect where proof shows uninterrupted use for the requisite period.* Where the proof shows uninterrupted use by the public of an alleged alley for the period necessary to establish a highway by prescription, the burden is upon the owner of the land to show that such use was under some license, indulgence or special contract inconsistent with a claim of right by the public.

4. SAME—*elements essential to establish highway by prescription.* In order to establish a highway by prescription the public use must be adverse, uninterrupted, continuous, exclusive and under claim of right; but there need be no claim of right in words, nor a declaration that the use is adverse, nor an admission by the land owner that he has knowledge of the adverse claim of right.

5. SAME—*when nature of use and knowledge of the land owner may be inferred.* The nature of the use of land by the public and the knowledge of the land owner of such use may be inferred from the manner, character and frequency of the exercise of the right and from the situation of the parties.

6. SAME—*whether the acts of the public charge notice depends largely upon the circumstances of each case.* The question whether the acts of the public are of such a nature that it will be in-

ferred the land owner has notice of their adverse character depends largely upon the circumstances of each particular case.

7. SAME—*when owner must be presumed to have knowledge of claim of right.* Where the line of travel over an alleged public alley has been substantially the same for half a century, during which time the use by the public has been continuous and uninterrupted, the owner of land over which the alley extends must be held to have knowledge of the claim of right by the public and adjoining owners to use the land as a public highway.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. C. F. IRWIN, Judge, presiding.

J. C. MURPHY, and E. L. LYON, for plaintiffs in error.

JOHN S. SEARS, and ROY J. SOLIFSBURG, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by plaintiffs in error in the circuit court of Kane county to enjoin defendants in error from obstructing an alleged alley in the city of Aurora. After a hearing the court dismissed the bill for want of equity. On the case being appealed to this court it was dismissed at the April term, 1915, for want of necessary parties. Thereafter this writ of error was sued out, all the complainants in the bill joining therein.

The strip of land in question which is claimed to be a public alley by prescription extends substantially north and south from New York street to Main street through about the center of block 5 of the original town of Aurora. Since the original platting of block 5 an assessor's survey has been made, and apparently the division into tracts and the location of the buildings still follow substantially the lines of the assessor's survey, and the lots mentioned in this opinion are according to the lot numbers in said survey. For the purpose of a better understanding of the

facts in this case a copy of said survey is given herein, with the side lines of the portion claimed as an alley added:

In order to avoid repetition, the strip claimed to be an alley will be termed in this opinion the "alley."

The evidence discloses that the block in question is located in the principal business portion of Aurora. Plaintiffs in error are the owners of most of the lots over which the alley passes, north of the line of defendants in error's property. Defendants in error own the southwesterly corner of block 5, on which they operate a flour mill, and over their tract the south seventy-five feet of said alley pass. The plat of block 5 does not show any alley dedicated at the time of the platting. When lots 1, 2, 3 and 4 were sold by the then owner, at quite an early day, a strip was reserved across them for use as an alley. No question is raised that the strip reserved for an alley across these four lots does not conform to the alley as claimed here. Nothing is shown in the evidence to indicate that the defendants in error or their grantors had made any objection to the use of this alley by the public or property owners in this block until shortly before this bill was filed, when they built a fence on their own property across the alley about

seventy-five feet north of the north line of Main street. It was to remove this fence that this bill was filed.

At the close of plaintiffs in error's case defendants in error moved to dismiss the bill for want of equity. While this is not considered proper practice, if such a motion is made it amounts to nothing but a submission of the case on the merits to the chancellor. (*Koebel* v. *Doyle,* 256 Ill. 610.) On the testimony offered by plaintiffs in error the court heard this motion and dismissed the bill for want of equity, entering a decree in accordance with that finding. The chief question in dispute is whether the proof in the record shows that this alley has been established by prescription, especially the south seventy-five feet across defendants in error's property. To settle this question necessitates an examination of the evidence.

The evidence, except in some unimportant details, is undisputed. There is testimony in the record as to the buildings on and use of this block for over seventy years prior to the time of the hearing. The lots facing Broadway were originally occupied by wooden buildings used largely for merchandise purposes and which have been replaced by the brick buildings now located thereon, used for like purposes. On the back of lot 1, facing on New York street, there is a brick building that has been in use for years. On the back of lot 2 is another building, now used for a livery stable. The buildings on the front and back of these two lots and on the front of lots 3 and 4 extend to the alley shown on the plat. Back of the buildings on Broadway from this point to the Hotel Arthur, (on lots 17, 18 and 19, on the southeast corner at Main and Broadway,) until recent years the buildings extended back only eighty feet, and therefore not quite to the east line of the alley as it is shown on the plat. The land between the back of the buildings and the east line of the alley, according to the testimony, was used for loading and unloading merchandise into the buildings, and the wagons of

the merchants, when not in use, frequently stood back of the buildings and teams were tied there. The property between the west line of the alley and the river on all lots between 2 and 9 was used at various times for out-buildings, horse sheds and junk piles, all of which were situated a little way back from the alley. On the back of lots 9, 10 and 11 for many years there have been sheds or barns used in connection with the buildings on the front of the lots. Originally just back of the building on lot 11 there was a platform used for loading and unloading mer-chandise, which extended towards the east line of the al-ley about eight feet. On the back part of this lot for some years was a tin-shop. No one took measurements of it, and the testimony as to its size differs largely, some stating it was ten by twelve feet, others that it was larger. It ex-tended east into the alley as it is shown on the plat, about four feet. For years, while it was located there, an over-head bridge extended from the building in front to this tin-shop, apparently being built to allow persons to cross between the store and the tin-shop without interfering with the traffic on the alley below, the bridge being high enough to allow ordinary teams to pass under. Some ten or fifteen years before the hearing, a mail carrier, who testified he drove through there daily with his covered wagon, caught the top of it on the bridge. He complained to the city au-thorities, and the owners, under the direction of the city, tore the bridge down. The tin-shop ceased to be used as such and was removed years before this hearing. The pres-ent owners of lots 9, 10 and 11, some six or eight years ago, extended their buildings twenty feet further back. A platform was also constructed on the back end of these buildings, about four feet wide, for loading and unloading. The barns on the back part of lot 10 had previous to that extended about four feet east of the west line of the pres-ent strip claimed as the alley. At the time these buildings were extended the owner of lot 10 cut four feet off the

269 — 37

east end of the barn, so that now the east ends of the barns and sheds on the back ends of lots 9, 10 and 11 extend to the west line of said alley. The alley across these lots is now eighteen feet wide, the platform back of these buildings extending about four feet into it. Lots 12, 13 and 14 have had buildings on them, eighty feet deep, for many years. Between the back ends of these buildings and the east line of said alley is a space of about twenty feet, which has been and is being used for the purpose of loading and unloading merchandise. Back of lot 12 and the north part of lot 13 is located a barn belonging to defendants in error, thirty by twenty-four feet in size. Its east line is the west line of said alley as shown on the plat. Lots 1 to 11, inclusive, run from Broadway to the river, but lots 12, 13 and 14 only run as far back as defendants in error's property. Some twenty years ago the owner of lot 13 built on the back end of his lot, immediately adjoining this barn and in a portion of the alley, a shed, which he used for storing salt in connection with his business. Many of the witnesses testified as to the size of this structure, but as they were relying on their recollection, only, they differed, some placing it as small as six by eight feet and others as large as sixteen by twenty. The weight of the testimony is that it was about ten feet east and west by twelve feet north and south. All the testimony agrees that this shed was only there for a few years and that it was torn down a number of years ago. Defendants in error own all the property extending from the rear ends of lots 19, 14, 13 and 12 to the river. Many years ago on this property a saw-mill and a grist-mill were located. The saw-mill apparently ceased to be used over fifty years ago, but the flour-mill is still in use and has been for over a half century. It is located, as already stated, on the southwest corner of this block. The property between this mill and the west line of said alley has always been unoccupied, except by the barn on the north end of defendants in er-

ror's property and an office about twenty feet square located on Main street and immediately adjoining the west line of said alley shown on the plat. About twenty-five feet east of this office stood for many years, until very recently, a building facing on Main street and adjoining the Hotel Arthur. The evidence tends to show that it was used for an office,—perhaps by defendants in error, as it was located on their property.

The testimony, without contradiction, shows that this alley as shown on the plat has been used for nearly three-quarters of a century as a driveway, not only by the owners of this property but by the public as well, for purposes of ingress and egress to and from the business property situated along Broadway and as a public driveway from New York street to Main street; that this property was also used for this purpose by defendants in error and their immediate and remote grantors; that the alley was thus used without any dispute or question or obstruction of any kind, previous to the building of this fence, except the tin-shop, the salt shed, the overhead bridge and the four-foot extension of the barn on the rear of lot 10; that the only present existing obstruction is the platform on the rear of lots 9, 10 and 11. The testimony is all to the effect that none of these obstructions ever prevented free travel through the alley, although the location of the tin-shop and the salt-shed, while there, caused the travel to jog to the east somewhat, in order to pass through the alley, but every witness who was asked with regard to these obstructions testified positively that these various structures did not interfere with the practical use of the alley. One of the witnesses who had been a United States mail carrier for thirty-six years, testified that during all that time he had driven through the alley, having gone through thousands of times; that he commenced in 1879, when Broadway was not paved, using it then because the alley was a better driveway than the street. He was the witness who

entered the complaint in regard to the overhead bridge which caused it to be torn down under direction of the chief of police. The owners or occupants of the buildings emptied their ashes and garbage into this alley and the city authorities had them removed. The testimony is also to the effect that on a number of occasions the city authorities repaired, with gravel, cinders or ashes, parts of the alley needing repairs. All the witnesses testified that until this dispute arose everyone understood that the alley was a public alley, and had always assumed they were driving over it as a matter of right and not as a matter of permission from any of the property owners. It was testified that the owner of lot 14 at one time talked of building across the alley on his lot, but the owners of the other lots told him he could not do this as it was a public alley, and that as a result of their objection he did not obstruct the alley by building thereon. The testimony is to the effect that the travel in and out of the alley at Main street was between the office building of defendants in error and where the old building was formerly located in the rear of the Hotel Arthur. There is testimony, however, to the effect that between the office building and the mill the property was vacant, and people sometimes drove into the alley by driving over the space between the office building and the mill instead of along the line of the alley as shown in the plat. There can be no dispute on this record as to this being the evidence, the only questions being as to whether there was a sufficiently definite and specific traveled way and whether this use of the south seventy-five feet of this alley was permissive or adverse.

Prescription, as the term is ordinarily employed, some authorities hold, presupposes a grant from the rightful owner. Where the use of a way has continued for the period prescribed by statute or for the period designated by the common law, the authorities usually hold that a right by prescription rests upon the presumption that the

way has been laid out theretofore by competent authority. (1 Elliott on Roads and Streets,—3d ed.—secs. 188, 189.) Whatever the doctrine upon which prescription is based, this court has held that in order to determine whether a road is a public highway by prescription it must be decided whether it has been used by the public as such highway for the period named in the statute. (*Township of Madison* v. *Gallagher,* 159 Ill. 105; *Village of Peotone* v. *Illinois Central Railroad Co.* 224 id. 101; see, also, *Doss* v. *Bunyan,* 262 Ill. 101.) In *City of Chicago* v. *Borden,* 190 Ill. 430, this court quoted with approval the rule that the public use of land for the period of twenty years as a highway, unexplained, will raise the presumption, without any positive agreement from the land owner, that it was done with his acquiescence, adversely and under a claim of right; and this is the general rule. After an uninterrupted use for the requisite period of enjoyment the owner of the land has the burden of proving that the use of the land was under some license, indulgence or special contract inconsistent with a claim of right by the other party. (Jones on Easements, sec. 186.) In order to establish a highway by prescription the public use must be adverse, uninterrupted, continuous, exclusive and under claim of right. (*Illinois Central Railroad Co.* v. *City of Bloomington,* 167 Ill. 9; *City of Chicago* v. *Chicago, Rock Island and Pacific Railway Co.* 152 id. 561.) An easement by prescription can be created only by an adverse use of the privilege with the knowledge of the person against whom it is claimed, or by acts so open and exclusive that knowledge will be presumed, exercised under a claim of right, adverse to the owner and acquiesced in by him. Such adverse user must have existed for a period equal at least to the period prescribed by the statute,—now fifteen years. (Hurd's Stat. 1913, sec. 139, p. 2147.) There need be no claim of right in words, or a declaration that the use is adverse, or an admission on the part of the land owner that he has knowl-

edge of the adverse claim of right. The nature of the use and the knowledge of the land owner may be inferred from the manner, character and frequency of the exercise of the right and the situation of the parties, and where an actual, uninterrupted use and enjoyment as of right, with knowledge of the other party, is shown to have existed a sufficient length of time to create the presumption of a grant, the presumption that it is a public highway stands as sufficient proof unless it is rebutted by other proof that the use and enjoyment were permissive. (*McCreary* v. *Boston and Maine Railroad Co.* 153 Mass. 300; *Deerfield* v. *Connecticut River Railroad Co.* 144 id. 325; Jones on Easements, sec. 164.) Adverse use has been variously defined as use under a claim of right known to the owner of the servient tenement; use such as the owner of an easement would make of it without permission asked or given, or use under claim of right inconsistent with or contrary to the interest of the other party. (22 Am. & Eng. Ency. of Law,—2d ed.—1193, and cases cited.) The user must be confined to a definite and specific line of way, (*City of Chicago* v. *Galt,* 224 Ill. 421; *O'Connell* v. *Chicago Terminal Railroad Co.* 184 id. 308;) and the travel by the public must be of such a nature as to indicate a claim of right. (*Town of Brushy Mound* v. *McClintock,* 150 Ill. 129.) Whether or not the acts of the public are of such a nature that it will be inferred that the owners have either actual or constructive notice must depend very largely on the circumstances of each case.

The testimony of all the witnesses in this record shows that the travel along this alley for nearly a half century has been practically along the same line. One of the witnesses said, in substance: "The line of that travel has never been changed, except possibly a little in the middle of the block. I don't think the wagon tracks over this right of way varied two feet during more than thirty-five years." Another testified that the travel has been along the line

of this alley during all this time with very little variation. Another witness testified that ninety-eight per cent of the travel across this block from New York street and Main street was within the boundary lines of this alley as shown on the plat. All the witnesses who testified on this subject agreed substantially on this question and there is no testimony in the record in any way contradictory. There is very little evidence in the record that furnishes any fair basis for the argument of counsel for defendants in error that the travel between Main and New York streets across block 5 was outside of the boundary lines of the tract claimed as the alley. It is evident from the testimony that whatever traveling was done outside of those lines was largely, if not entirely, due to driving teams to or from the rear of the various business places or to or from the mill of defendants in error or the barns or sheds at the rear of the lots. The use of this alley was so open and notorious that it must be presumed, on this record, that the defendants in error had knowledge of the claim of right by the parties owning property adjoining said alley and by the public generally. (*Smith* v. *Roath,* 238 Ill. 247.) As was said by this court in *City of Chicago* v. *Sawyer,* 166 Ill. 290, where it was held that an alley was established by prescription by twenty years' adverse user, "the use was actual, open and uninterrupted for more than twenty years, and everyone who saw fit exercised the right" to travel over it. Use was made not only by the property owners immediately adjoining it but by the public generally, and the public authorities, when necessary, made slight repairs to keep it in condition to travel over, and the use was sufficient to create an easement by prescription.

The mere fact that years ago obstructions were placed in other parts of the alley, which did not seriously interfere with travel back and forth through it, would in no way lessen the claim of right in the public to the south seventy-five feet of the alley in question. It is plain from

the record that it was never understood that these obstructions were placed there as a matter of right but that they were permitted rather on sufferance, and never seriously interfered with the use of the passageway for the purpose for which it was intended. Such obstructions in no way negative the right of an easement by prescription. *Smith* v. *Roath, supra.*

The decree of the circuit court will be reversed and the cause remanded, with directions to that court to enter a decree in accordance with the views herein set forth.

*Reversed and remanded, with directions.*