2020 IL App (2d) 190456-U
No. 2-19-0456
Order filed March 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| STEELE'S 126 LLC, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CH-74 |
| | ) | |
| MILES GILLOTT, | ) | Honorable |
| | ) | Donna R. Honzel, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Presiding Justice Birkett and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's ruling in favor of Steele's, that a recorded easement and prescriptive easement existed on Gillott's property, was not against the manifest weight of the evidence.

¶ 2    Plaintiff, Steele's 126 LLC (Steele's), brought a complaint against defendant, Miles Gillott, claiming that it was entitled to use alleged recorded and prescriptive easements on Gillott's property. The trial court agreed with Steele's, and Gillott appeals from the trial court's ruling. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 Gillott owns an L-shaped parcel of real estate located at 130 N. Madison Street in Rockford (130 Parcel). Steele's owns a neighboring parcel of real estate located at 126 N. Madison Street in Rockford (126 Parcel). The 126 Parcel fits within the rectangular space left by the L-shaped 130 Parcel. The short part of the "L" of the 130 Parcel consists of a vacant lot (130 Lot) behind the 126 Parcel, between the 126 Parcel and an alley to the west. The 126 Parcel is a zero-lot-line parcel with a building that fronts Madison Street to the east and has a fully-exposed basement on the west side. Therefore, the building is street level on the Madison Street side, and it drops down to "ground level" on the west side. The west side of the building has an overhead garage door that provides access to the building's basement. At issue in this case are two putative easements that run across 130 Lot, between the 126 Parcel and the alley.

¶ 5 On January 26, 2018, Steele's filed an action against Gillott and others to quiet title and for other relief. Steele's alleged that it purchased the 126 Parcel on December 21, 2017, and that the property included a non-exclusive easement for ingress and egress over the southerly 12 feet of width and 95.1 feet in length of the 130 Lot (Recorded Easement). It also alleged that there was a second, parallel strip of land (Prescriptive Easement[1]) with the same dimensions as the Recorded Easement. Steele's alleged that the prior owners of the 126 Parcel had openly and continuously used the Prescriptive Easement for over 40 years as a road to access the garage door on the west side of the building. Steele's further alleged that the second easement was the only means of

---

[1] We use this phrase as a shorthand to describe the second strip of land, recognizing that it was an *alleged* prescriptive easement.

vehicle ingress and egress for the 126 Parcel to travel from the garage door to a public road via the alley, and that the prior owners obtained a prescriptive easement over that land.

¶ 6     Steele's sought to quiet title on the Recorded Easement and obtain a prescriptive easement over the second strip of land. It also alleged a nuisance claim that is not related to this appeal.

¶ 7     Steele's attached to its complaint a trustee's deed conveying Steele's the 126 Parcel. The legal description of the property included the following:

"Non-exclusive easement for ingress and egress over the Southerly Twelve (12) feet in width of the Westerly Ninety-five and One Tenth (95.1) feet of said Lot One (1) as said right is described in an instrument dated August 27, 1946 and recorded in Book 540 of Recorder's Records on Page 87 in the Recorder's Office of Winnebago County, Illinois; situated in the County of Winnebago and State of Illinois."

¶ 8     On April 13, 2018, Steele's filed a motion for a temporary restraining order and a preliminary injunction. It alleged that after it filed suit, defendants placed a concrete barrier on the Prescriptive Easement, preventing Steele's from using the Prescriptive Easement and from entering and exiting its private garage. On June 26, 2018, the trial court granted Steele's request for a temporary restraining order and enjoined any interference with access to the garage. The trial court ordered that the concrete barrier be removed within 72 hours of the order's entry. On August 17, 2018, the trial court granted Steele's request for a preliminary injunction.

¶ 9     On January 24, 2019, Gillott filed affirmative defenses alleging that the Recorded Easement was abandoned. He alleged that the Prescriptive Easement was not continuously used in the manner necessary for the amount of time legally required for a prescriptive easement; that the

use was permissive and pursuant to an agreement; and that the easement was lost due to failure to contribute to the maintenance of the underlying property.

¶ 10    On March 26, 2019, Gillott was given leave to file counterclaims; he sought to quiet title to both easements.

¶ 11                                                      A. Trial

¶ 12    A bench trial took place on April 15, 2019.[2] Ray Eissens, Steele's predecessor-in-interest, provided the following testimony. He purchased the 126 Parcel in December 1977, and it remained in his name until 2015, when he transferred it to a family trust. The family trust sold the property to Steele's in 2017. Both of the transferring documents contained the aforementioned language conveying the Recorded Easement. See *supra* ¶ 7.[3]

¶ 13    Eissens used the 126 Parcel for his business, Evergreen Irrigation. He used the lower level of the building to store his trucks, equipment, and inventory. He and his employees drove over the areas identified as the Recorded Easement and Prescriptive Easement[4] to access the back of the building through the garage door. From 1977 to 1990, they would drive over the area several times

---

[2] The trial took place before a different judge than the judge who had granted Steele's requests for a temporary restraining order and preliminary injunction.

[3] Steele's also entered into evidence deeds from the 130 Parcel that refer to the Recorded Easement.

[4] The exhibit entered into evidence was the same map as had been attached to the complaint, except that it listed the Prescriptive Easement as being 15 feet wide instead of 12 feet wide.

a day, five to six days per week, from mid-March to mid-December. The work was seasonal, so their use decreased from mid-December to mid-March to about once or twice a day, at least three days per week. They could have begun their approach to the garage door in different ways, but they would have to be lined up with the garage door in order to be able to enter the garage. Eissens never measured the Recorded Easement, but he believed that its width "would probably not quite [reach] to the overhead door." A car driving straight down the Recorded Easement would not be able to enter the garage.

¶ 14 Eissens' use of the easement changed in 1990 because he purchased the property across Madison Street. He thereafter had two facilities where he stored inventory and that his trucks accessed. However, he continued to store equipment and inventory in the lower level of the building on the 126 Parcel, and trucks continued to use the easements to access the lower level. In 2006, Eissens' wife and daughter started parking in the lower level on a daily basis. Some employees also parked in the Recorded Easement, and they would walk across the easements to get to the top level of the building, where they punched in. About six cars could park on the Recorded Easement.

¶ 15 Eissens picked up garbage from the easements about every other week. He additionally plowed the snow from the easements from 2008 to 2010. Around 2010, he had gravel spread over the easements. Specifically, he had a friend bring a skid loader and level out the Recorded Easement area so that it could be used for parking.

¶ 16 A man named Larry Ward operated a business called Giolitto Sheet Metal on the 130 Parcel. That business never placed equipment or materials in front of the garage door such that Eissens could not access the back of his building. Gillott once parked his car in a manner that made

it difficult for Eissens' wife to exit, because other cars were parked along the Recorded Easement. However, Gillott moved his car to allow her to leave. Other than that, there was never anyone blocking or prohibiting him from accessing the garage via the easements. Eissens continuously used the easements from 1977 until December 2017 to access the garage door. He never asked for permission to drive over the easements, nor did anyone tell him that he could not use them.

¶ 17    Eissens admitted that there was a time he instructed his employees to no longer park along the back wall of his building, so as to create a passage out for the 130 Parcel. Eissens issued this instruction after Gillott called the police. In the early 1990s, Eissens bricked in windows to the sides of the garage door. The city was redoing Madison Street and its sidewalks, and the city had instructed Eissens to fill in "some vaults" on the building "that were under the sidewalk." Therefore, it was a convenient time to also do the brick work on the back of the building. Eissens later asked an employee to begin removing the bricks, but they ceased at Gillott's request. Ultimately, Eissens and his employees stopped parking in the Recorded Easement because Gillott said he needed more parking for his tenants. Gillott expressed an interest in buying the 126 Parcel more than once, but Eissens never said that he would sell it to him.

¶ 18    Allie Beary, Eissens' daughter, testified that she had worked for Evergreen Irrigation part-time since 1995 and full-time since 2003. The basement of the 126 Parcel building, which was accessible from the garage door, was used to store files, air compressors, off-season equipment, and inventory. Trucks accessing the basement would drive through the Recorded Easement and Prescriptive Easement areas. She was never aware of a time that the access way was blocked. In the fall of 2006, she was pregnant, so Eissens cleared out the basement so that she could drive into the garage and park inside. Beary's mother would arrive around 6 a.m. and park in the basement,

and when Beary arrived between 8 and 9 a.m., her mother would move her car so that Beary could park inside. The Prescriptive Easement was the easiest route into the garage, but if a truck or trailer was parked in the way, Beary would drive around it to enter the garage.

¶ 19    Michelle Schmid provided the following testimony. She worked for Giolitto Sheet Metal, located on the 130 Parcel, from 1995 to 2005 as a sheet metal journeyman. Ward was her boss. Schmid usually worked from 7 a.m. to 3 p.m. Her location in the building allowed her to observe what happened in the 130 Lot. Giolitto Sheet Metal had a dumpster and a stack of "skids" in the 130 Lot. They prevented taking a direct path from the alley to the garage door of the 126 Parcel, but "you could have got around it." Ward told his employees to "keep the space open in case they [Evergreen Irrigation] needed to get in there for anything." Schmid saw the garage door of the building on the 126 Parcel open only a handful of times in the ten years she worked at the site. Schmid believed that there was a boat and an old car stored inside. Schmid admitted that she had to pay attention to the machine she operated, but she testified that she "was very good at operating the machine and *** could do it with [her] eyes closed," and that she "did a lot of daydreaming looking out the door too."

¶ 20    We next summarize the testimony of Gillott. He entered into a contract with Ward to purchase the 130 Parcel in 2000 and began remodeling it at that time, though the closing on the property did not occur until 2005. The Eissens family and Evergreen Irrigation used the easements to access the back garage in the years 2000 to 2004. However, from 2004 on, they would use the back only occasionally, because they had acquired the other property across the street. When they used the easements, it was with Gillott's permission. Gillott granted permission "[f]rom day one" by "allowing this to happen."

¶ 21    Gillott admitted that from 2015 to the time of trial, he was at his property only a couple of days during the week, so he did not have personal knowledge of what went on the other days during that time period. Gillott recently measured the Recorded Easement and found that it extended about four inches into the overhead door area. The width of the overhead door was approximately nine feet.

¶ 22    In 2006, Eissens asked if he could park six cars on the Recorded Easement, and Gillott agreed. Around the same time, Gillott allowed Eissens' wife and daughter to drive across the 130 Lot to enter the garage on the 126 Parcel. They got blocked in by parked cars more than once, and Gillott said that Eissens' employees should move their cars before Gillott told his employees to move their cars. Eissens never paid to have the easements plowed or graveled. However, when Gillott gave him permission to park six cars on the Recorded Easement, Eissens could do so only by making the lot more level, and Gillott gave Eissens permission to level the lot. In September 2008, Eissens asked if he could park a total of 10 cars on the Recorded Easement. However, "ten cars could not logically fit on the" Recorded Easement, so Eissens parked additional cars on the Market Street side of Gillott's building. Thereafter, Eissens also plowed snow from the 130 Lot. Gillott told Eissens to leave space at the end of the Recorded Easement for another business to park its cars, and Eissens complied.

¶ 23    At one point, Eissens had a worker start removing bricks at the north end of the back of the building to create a doorway from what used to be a window. That section was not adjacent to either easement. The worker stopped only after Gillott called the police. The city then suspended Eissens' building permit.

¶ 24    After buying the 130 Parcel, Gillott discussed purchasing the 126 Parcel with Eissens many times between 1999 and 2017; Eissens said about one dozen times that he would sell the property to Gillott. The "gist" of the conversations was, "[W]ho would want to buy a building if they couldn't enter form the rear?" That is, because Gillott owned the 130 Lot, anyone else that Eissens sold his property to would "be locked out." Eissens' asking price started low and then increased every time Gillott talked to him. Gillott believed that they had an informal arrangement by which Gillott would eventually purchase the 126 Parcel, and Gillott first learned that Eissens had sold it to another party in December 2017. When Gillott called Eissens, Eissens denied ever talking to Gillott about selling the property or that they "ever talked about the abandoned easement."

¶ 25    A local business called Standard was completed in 2016, and six months to a year before it opened, Gillott allowed its owners to park cars on the Recorded Easement. Eissens never objected. However, within a month after Steele's bought the 126 Parcel, Steele's filed this lawsuit, which also named Standard as a party.

¶ 26    A couple weeks before trial, Steele's unbricked a doorway to the right/south of the garage door and installed a new door. When asked if he did not want Steele's to have access to the back of the building from either easement, Gillott replied, "They don't deserve any access to 126."

¶ 27                              B. Trial Court's Ruling

¶ 28    The trial court filed its written memorandum of decision and order on May 1, 2019; we summarize its ruling. Regarding the Recorded Easement, there was no question that it was an express grant of an easement that had been in place for a significant period of time, and that the parties were on notice of its existence at the time of their respective purchases. Gillott argued that the express grant of the easement by deed was abandoned by three sets of facts. First, Eissens

asked for permission park six and then ten cars, used the Recorded Easement for parking, and then later agreed not to park there. Second, Eissens bricked in the windows[5] of the lower level of the 126 Parcel. Third, Eissens' failure to contribute towards the maintenance of the easement showed an intent to abandon it or breached the grant language sufficient to void it.

¶ 29    The first argument was not valid because mere nonuse of an easement does not amount to an abandonment of an easement created by grant. Also, the Recorded Easement was for equal rights to use and for ingress and egress, so asking permission to park on the property was appropriate given that both parties had equal right to use the land. This was also true regarding Eissens' acquiescence to not park on all or certain parts of Recorded Easement at times. The evidence further showed that the Recorded Easement encompassed 4 inches of the overhead door, which contributed to showing that Eissens used the Recorded Easement for access for a period dating back to December 1977.

¶ 30    The bricking in of windows also was not evidence of abandonment, because the windows would not have been used for access into the building.

¶ 31    For the maintenance issue, on the one hand Gillott was arguing that Eissens never helped out with maintenance, but he also agreed with Eissens' testimony that Eissens leveled the sloping area of the Recorded Easement and added gravel to make it easier to park on. He also agreed that

---

[5] The drawing from an engineering firm that Steele's introduced into evidence labels the "windows" as former doorways. In photographs admitted into evidence, the bricked-in openings do not appear to extend to the ground. It is therefore unclear whether they were originally windows, doorways, or a combination of a window and a doorway.

Eissens plowed the lot for a couple of years. Eissens testified that he plowed the lot regularly from 2008 to 2010, that he spread gravel on the lot in 2010, and that he picked up garbage on the lot. Accordingly, Gillott's argument failed.

¶ 32    The trial court found:

"that [Steele's] has a legal right in the recorded easement, and that right is equal to the right of [Gillott] and/or his successors, for use and for ingress/egress of the described property. In so finding, the Court recognizes that the parties will need to deal with one another in good faith so that one does not interfere with the rights of the other as to this strip of land. Either this strip of land remains open completely or the parties reach an agreement allowing an equal number of parking spaces which do not block ingress/egress into what has recently become a door."

¶ 33    Turning to the claim for a prescriptive easement, Steele's had to show that the use of the land was adverse, uninterrupted, exclusive, continuous, and inconsistent with that of the true owner. To show that the use was adverse, Steele's had to show that the use was with the knowledge and acquiescence, but not permission, of the landowner. A rebuttable presumption of adversity arose if the claimant's use of the property persisted for 20 or more years.

¶ 34    Schmid's testimony confirmed that Ward had acknowledged that Eissens used the 130 Lot to access the back of the 126 Parcel. Specifically, Schmid testified that Ward told his employees to keep the path to the garage generally open, with access only temporarily blocked. Schmid offered no testimony that this was anything more than acquiescence by Ward. Eissens provided unrebutted testimony that he never obtained permission by Ward to walk/drive across the 130 Lot. The testimony as a whole established at least an acquiescence to a prescriptive easement.

¶ 35    Schmid drew a diagram of how the property looked when she worked there. The drawing had a clear opening from the west edge of the property to the overhead door, and she testified that a car could drive around the dumpster/skids to reach the overhead door. She was aware that Eissens used the basement of his building for storage, and Ward's employees did not block access to it, except temporarily. However, she also testified that she did not recall seeing anyone going in or out of the garage. Given Schmid's testimony about the location of the machine she operated relative to the door on the south side of her workplace, her testimony that she kept a close eye on the comings and goings in the lot over the years was less than credible. She also provided conflicting testimony as to how often people accessed the overhead door area. Nevertheless, she did not change her testimony that she and her fellow employees were instructed not to block the overhead door.

¶ 36    Eissens testified that he regularly used the 130 Lot to gain access to the basement, through the overhead door, and that he did so several times a day, five to six days a week, beginning in December 1977. At that time, Anton Giolitto owned the property. Eissens provided unrebutted testimony that he never asked Giolitto for permission to drive to his overhead garage, and he was never told he could not do it after he began. Eissens' use of the garage decreased in 1990, when he purchased the property across Madison Street, to at least three to four times per week. It went back to daily use around 2006, when Beary started parking in the basement. Eissens testified that the whole time, from 1977 to 2017, there was foot traffic into the overhead door area in addition to vehicle traffic.

¶ 37    Beary testified that she would drive across the 130 Lot into the garage beginning in the fall 2006, when she was pregnant. Occasionally something would block her direct access, but she could

drive onto the Recorded Easement to get around it. Gillott argued that there could not be a prescriptive easement because the path to the garage was variable. However, considering the width of the garage door and testimony that any variations to enter the garage would be small, the evidence did not support Gillott's argument, because it is the use that defines a prescriptive easement, and precise dimensions and locations are not required.

¶ 38     The combined testimony of Eissens, Schmid, and Beary supported a prescriptive easement dating back to December 1977. Therefore, December 1997 would mark 20 years of the use of the path to the overhead door in a continuous manner, inconsistent with the property rights of Giolitto and Ward. By the time Gillott purchased the 130 Parcel in 1999, the Prescriptive Easement was well-established. Significantly, Gillott did not provide any evidence that he did anything to alter the Prescriptive Easement, in that there was no evidence that he gave specific permission to Eissens to use the easement.

¶ 39     The testimony established that the Recorded Easement included about four inches of the overhead door. It also showed that the garage was approximately 9'1" in width. This would establish a prescriptive easement of about 9 feet north beyond the Recorded Easement, so as to fully encompass the width of the overhead door. The Prescriptive Easement was for ingress and egress only, and not for parking or other use.

¶ 40     Case law was clear that when a prescriptive easement is found to exist, the extent of the use defines the easement. Eissens and Beary testified that trucks would come to the overhead door as early as 6 a.m. and were in and out generally during the daytime hours, finishing at the latest at 8 p.m. in the summer months. The easement was used between three and six days per week, and only to either walk to the overhead door or drive into the building, and either to park inside or

obtain items stored therein. Steele's "use of the prescriptive easement can be no greater than what has been established, above." A question was asked during argument whether a supply truck would be able to deliver to the overhead door. "The answer would be yes, but the delivery truck could be in front of the overhead door only as long as necessary to perform the delivery."

¶ 41     The trial court granted Steele's request to quiet title as to the Recorded Easement and to confirm the establishment of the Prescriptive Easement. Gillott timely appealed.

¶ 42                                   II. ANALYSIS

¶ 43     We initially address the standard of review. Gillott argues that this appeal involves the application of law to a "seemingly undisputed set of facts," so we should review the trial court's ruling *de novo*. Steele's argues that a manifest-weight-of-the-evidence standard applies. We agree with Steele's. The trial court's determination of whether an express easement has been abandoned will not be reversed unless it is against the manifest weight of the evidence. *Flower v. Valentine*, 135 Ill. App. 3d 1034, 1039 (1985). Similarly, whether a party has established an easement by prescription is a question of fact, and we will not disturb the trial court's finding unless it is against the manifest weight of the evidence. *Rainbow Council Boy Scouts of America v. Holm*, 2018 IL App (3d) 160715, ¶ 10. A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or not based on the evidence presented. *Schroeder v. Post*, 2019 IL App (3d) 180040, ¶ 13. We note that the manifest-weight-of-the-evidence standard is particularly applicable here, as the trial court explicitly made credibility determinations and resolved conflicts in the evidence to arrive at its factual findings and ultimate decision.

¶ 44    Gillott challenges the trial court's rulings regarding both the Recorded Easement and Prescriptive Easement. An easement is a privilege in land, which is distinct from ownership of the underlying land, and the easement is an estate or interest in itself. *JCRE Holdings, LLC v. GLK Land Trust*, 2019 IL App (3d) 180677, ¶ 13. An easement may be created only by grant, implication, or prescription. *Hess v. Miller*, 2019 IL App (4th) 180591, ¶ 27. The rights created by an easement will pass to and be binding on all subsequent grantees of the respective tracts of land. *Flower*, 135 Ill. App. 3d at 1039.

¶ 45    Regarding the Recorded Easement, Gillott argues that it should be deemed abandoned based on prior affirmative acts, the lack of contribution to maintenance, and its impracticality as construed by the trial court.

¶ 46    Simple nonuse does not create the abandonment of an easement created by grant, but rather there must also be circumstances showing an intent of the dominant owner to relinquish his right. *Egidi v. Town of Libertyville*, 251 Ill. App. 3d 224, 232 (1993). "While the failure to use an easement for the purpose created may be a circumstance to be considered on the question of intent to abandon, no abandonment is shown where there is no evidence to prove an intent by the owner of the dominant estate to abandon the easement permanently." *Id.*

¶ 47    Gillott argues that ingress and egress to the 126 Building across the Recorded Easement has never been possible since Eissens purchased it, as any entrance door had already been bricked off. Gillott points out that Eissens further testified that he bricked off windows in the early 1990's. Gillott maintains that the multiple affirmative acts of bricking off whatever door existed and then bricking in the window reflect an abandonment of the Recorded Easement, in that it effectively became an easement to nowhere. Gillott argues that Eissens also acknowledged on multiple

occasions that the Recorded Easement did not exist, in that he honored Gillott's parking instructions for that area, and when he decided to install a door at the back of the building, he tried to do so on the northern end, and not within the Recorded Easement space. Gillott further argues that although the 1946 deed calls for the dominant parcel owner to participate in maintenance, Eissens did not contribute to graveling the lot, apart from the time he did so for the purpose of allowing his employees to park there.

¶ 48    We conclude that it was not against the manifest weight of the evidence for the trial court to find that the Recorded Easement was not abandoned. As stated, simple nonuse does not result in the abandonment of an easement created by grant (*Egidi*, 251 Ill. App. 3d at 232), so the act of bricking off an alleged door that was not part of the easement is not dispositive. This is especially true of bricking off a window, as it would never have been used to enter the building. That Eissens attempted to install a door outside of the Recorded Easement area is also not an affirmative manifestation of abandoning the Recorded Easement, especially considering that there was no evidence offered as to why he was choosing that location for the door.

¶ 49    More significantly, contrary to Gillott's argument that the Recorded Easement was abandoned, both Eissens and Beary testified that they and company employees used the Recorded Easement as part of the path for accessing the garage. That the overhead door lined up with four inches of the Recorded Easement was further evidence that part of that easement would have been used when approaching, parking in front of, or entering the garage. Gillott argues that a four-inch width cannot show "the intent of the ingress and egress easement." Gillott's argument misses the mark, as the easement was recorded, and thus the issue here is whether it was abandoned. The fact that the overhead door overlapped with a small portion of the Recorded Easement, and the evidence

at trial showing frequent use of the overhead door, are simply circumstances that weigh against a finding against abandonment. There was also testimony that company employees parked on the Recorded Easement during certain years and then walked along the easement to the front of the building to punch in. Accordingly, there was ample evidence of use of the Recorded Easement, as opposed to its abandonment.

¶ 50   As for parking, as the trial court pointed out, the Recorded Easement allowed for equal rights for ingress and egress, which would not include parking on the property. Therefore, the fact that Eissens asked Gillott for permission to park on the property and acquiesced to his parking instructions would not constitute abandonment of the underlying easement. Regarding the subject of maintenance of the Recorded Easement, Gillott does not cite any authority as to whether and under what circumstances the failure to maintain a recorded easement will result in its abandonment. See *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33 (a reviewing court is not a repository into which an appellant may dump the burden of argument and research, nor is it our obligation to act as an advocate, and the failure to clearly define issues and support them with authority results in forfeiture of the argument). In any event, here there was evidence that Eissens did take measures to maintain the Recorded Easement. Eissens testified that he picked up trash from the easements every other week and plowed snow from the easements from 2008 to 2010. He also testified that in 2010, he had the Recorded Easement leveled out and spread gravel over both easements.

¶ 51   Gillott argues that the trial court's construction of the Recorded Easement is impractical in that the trial court stated that it was for both ingress and egress but could also be used for parking. Gillott contends that parking unduly expands the "ingress and egress" language of the easement.

He argues that parking cars on the Recorded Easement would also require walking on areas that are not part of the easement to get to the 126 Parcel, and that nothing in the easement provides guidelines as to how the parking would be divided.

¶ 52    The trial court stated: "*Either this strip of land remains open completely* or the parties reach an agreement allowing an equal number of parking spaces which do not block ingress/egress into what has recently become a door." (Emphasis added.) As such, the trial court did not rule that the Recorded Easement provides for the right to parking, but rather stated that the parties could mutually agree to allow parking on the easement. If Gillott does not wish for either party to be able to park on the Recorded Easement, he simply need not enter into such an agreement.

¶ 53    Moving on to the issue of the Prescriptive Easement, Gillott argues that the trial court's ruling was erroneous because the path at issue was not continuously used, and the trial court's grant is broader in scope than the prior use.

¶ 54    A party seeking to establish an easement by prescription must prove that the use of the land was adverse, exclusive, continuous, uninterrupted, and under a claim of right. *Mazal v. Arias*, 2019 IL App (1st) 190660, ¶ 20. These elements must have been present for at least 20 consecutive years. 735 ILCS 5/13-101 (West 2018); *Mazal*, 2019 IL App (1st) 190660, ¶ 20.  The burden of proving a prescriptive right is on the party alleging such a right, and each element must be distinctly and clearly proven. *Rainbow Council Boy Scouts of America v. Holm*, 2018 IL App (3d) 160715, ¶ 10.

¶ 55    Gillott argues that Steele's failed to meet its burden of proving a prescriptive easement because the testimony of both Eissens and Beary showed that the precise path at issue was not continuously used without interruption. Gillott acknowledges that the trial court cited *Chicago*

*Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 44, where the appellate court rejected the defendants' argument "that before continuous use may be found, evidence of the precise locations and dimensions must be adduced to prove the 'extent' of the easements." The appellate court stated that "[s]uch precise proof of an easement is not required because 'the extent of the prescriptive use defines the easement.' " *Id.* (quoting *Vallas v. Johnson*, 72 Ill. App. 3d 281, 284 (1979)). The court stated that an easement's actual use determines its width. *Id.* However, Gillott cites *Thorwood v. Scheets*, 269 Ill. 573, 582 (1915), where our supreme court stated that the "user must be confined to a definite and specific line of way." The supreme court pointed to witnesses' testimony that travel along an alley had been practically along the same line for nearly 50 years; that one witness testified that the wagon tracks over the right of way did not vary more than two feet during more than 35 years; and that another witness testified that 98% of travel across the block was within the boundary lines of the alley shown on the plat.

¶ 56     Gillott's argument is not persuasive. Although the supreme court in *Thorwood* referred to a "specific line" of travel, it is clear that the court did not literally mean an exact path, for even in the facts before the court, the wagon tracks varied up to two feet. *Thorwood* can be contrasted to *Bogner v. Villiger*, 343 Ill. App. 3d 264, 270 (2003). In *Bogner*, the appellate court held that no prescriptive easement existed where the path varied 9 feet after 17 years and thereafter encroached upon the property rights of different parties. The facts in this case are much closer to *Thorwood* than to *Bogner*.

¶ 57     The path of the Prescriptive Easement was largely controlled by the location of the overhead door, which extended only about four inches onto the Recorded Easement but about nine feet in the other direction. Eissens testified that although a driver could begin his approach to the

garage in different ways, the driver would have to be lined up with the garage in order to be able to enter. Beary testified that driving along the Prescriptive Easement "would have been the, the easiest way, however, if anything was parked there perhaps a truck, perhaps a trailer, I would drive around to get into the garage door." Schmid testified that Ward instructed his employees to keep access to the garage open, and there was undisputed evidence that cars parked on the Recorded Easement for a number of years. Thus, the evidence showed that driving along the Prescriptive Easement was the most direct path to the garage, but that people would drive around any obstructions that happened to be there. As *JS II, LLC* instructs, exact locations and dimensions are not necessary to prove the existence of a prescriptive easement, because the focus is on the prescriptive use. Here, the Prescriptive Easement was used to be able to drive to the garage, and, correspondingly, the trial court limited the Prescriptive Easement to nine feet beyond the Recorded Easement so as to fully encompass the width of the overhead door. See *JS II, LLC*, 2012 IL App (1st) 063420, ¶ 95 ("An easement's actual use determines its width."). As such, we cannot say that the trial court's finding that Steele's established a prescriptive easement was against the manifest weight of the evidence.

¶ 58     Last, Gillott argues that the trial court awarded a use that greatly differs from the use shown at trial. He maintains that the testimony does not show that any third-party vehicles ever used the Prescriptive Easement to access the building on the 126 Parcel through the garage door, but rather it was used only by employees of Eissens. Gillott points out that, however, the trial court's ruling states that third-party delivery trucks could use the Prescriptive Easement. Gillott argues that such use is outside of any use even arguably established, and it is even outside the scope of the trial court's own ruling that Gillott was "permanently enjoined from interfering or hindering the right

of [Steele's], it employees, officers, agents or tenants, from ingress and egress over this prescriptive easement." Gillott cites *In re Onarga, Douglas & Danforth Drainage District of Iroquois County*, 179 Ill. App. 3d 493, 494-95 (1989), where the court stated that "the courts of review in our state has been loath to increase the usage to which an easement is put even through [*sic*] the proposed use is relative to the original purpose of a constituted easement." Gillott contends that the trial court also provided no boundaries to the use, in terms of number of times per day, time of day, or purpose, such that material terms of the prescriptive easement are missing.

¶ 59    Again, we conclude that the trial court's ruling regarding the Prescriptive Easement was not against the manifest weight of the evidence. In *Onarga*, the court held that an easement for 20-inch drainage tiles could not be increased to 24-inch drainage tiles, because increasing the tile size would also improperly increase the size of the easement. *Id.* The court stated that "if an easement arises by prescription, the extent of the prescriptive use defines the easement." *Id.* at 495. Similarly, in *Klose v. Mende*, 329 Ill. App. 3d 543, 549 (2001), the court held that the easement holder could not demand that an extra five to six feet of roadway be made available to him as of right.

¶ 60    Here, the trial court limited the Prescriptive Easement to ingress and egress, as the evidence showed that it had not been used for parking. It further stated that trucks using the easement would begin as early as 6 a.m. and generally limited to daytime use, though they would finish at the latest at 8 p.m. in the summer. The trial court stated that the easement was used three to six days per week; to either walk to the garage door or drive into the building; and to either park in the basement or access items. The trial court stated that Steele's "use of the prescriptive easement can be no greater than what has been established, above." Thus, the trial court focused on the "use" of the easement, such that whether the trucks using the easement belong to Steele's directly, to its tenant,

or to third-party vendors is not material. See *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 95 (an easement's use determines its character); *cf. Limestone Development Corp. v. Village of Lemont*, 284 Ill. App. 3d 848, 856-57 (prior casual and seasonal use of prescriptive easement by personal vehicles did not allow easement holder to bring heavy equipment or heavy trucks on the road). Further, the above-mentioned findings discredit Gillott's arguments that the trial court failed to define how often and at what times the Prescriptive Easement may be used.

¶ 61                                      III. CONCLUSION

¶ 62      For the foregoing reasons, we affirm the judgment of the Winnebago County circuit court.

¶ 63      Affirmed.